HUDSON ET AL. *v.* UNITED STATES

No. 96–976.   Argued October 8, 1997—Decided December 10, 1997

REHNQUIST, C. J., delivered the opinion of the Court, in which O'CONNOR, SCALIA, KENNEDY, and THOMAS, JJ., joined. SCALIA, J., filed a concurring opinion, in which THOMAS, J., joined, *post*, p. 106. STEVENS, J., *post*, p. 106, and SOUTER, J., *post*, p. 112, filed opinions concurring in the judgment. BREYER, J., filed an opinion concurring in the judgment, in which GINSBURG, J., joined, *post*, p. 115.

*Bernard J. Rothbaum* argued the cause for petitioners. With him on the briefs were *Jack L. Neville, Jr., Lawrence S. Robbins, C. Merle Gile, James A. Rolfe,* and *Lynn Pringle.*

*Deputy Solicitor General Dreeben* argued the cause for the United States. With him on the briefs were *Acting*

*Solicitor General Dellinger, Acting Assistant Attorney General Keeney,* and *Paul R. Q. Wolfson.**

CHIEF JUSTICE REHNQUIST delivered the opinion of the Court.

The Government administratively imposed monetary penalties and occupational debarment on petitioners for violation of federal banking statutes, and later criminally indicted them for essentially the same conduct. We hold that the

---

*Briefs of *amicus curiae* urging reversal were filed for the National Association of Criminal Defense Lawyers by *Arthur F. Mathews* and *Lisa Kemler;* and for the Washington Legal Foundation by *Daniel J. Popeo.*

A brief of *amici curiae* urging affirmance was filed for 48 States and Territories by *Betty D. Montgomery,* Attorney General of Ohio, *Jeffrey S. Sutton,* State Solicitor, and *David M. Gormley,* Assistant Attorney General, *Jan Graham,* Attorney General of Utah, *Carol Clawson,* Solicitor General, and *Marian Decker,* Assistant Attorney General, *John M. Bailey,* Chief States Attorney of Connecticut, *Jo Anne Robinson,* Interim Corporation Counsel of the District of Columbia, and by the Attorneys General for their respective jurisdictions as follows: *Bill Pryor* of Alabama, *Bruce M. Botelho* of Alaska, *Toetagata A. Mialo* of American Samoa, *Grant Woods* of Arizona, *Winston Bryant* of Arkansas, *Daniel E. Lungren* of California, *Gale A. Norton* of Colorado, *M. Jane Brady* of Delaware, *Robert A. Butterworth* of Florida, *Michael J. Bowers* of Georgia, *Margery S. Bronster* of Hawaii, *Alan G. Lance* of Idaho, *James E. Ryan* of Illinois, *Jeffrey A. Modisett* of Indiana, *Thomas J. Miller* of Iowa, *Carla J. Stovall* of Kansas, *Richard P. Ieyoub* of Louisiana, *J. Joseph Curran, Jr.,* of Maryland, *Frank J. Kelley* of Michigan, *Hubert H. Humphrey III* of Minnesota, *Michael C. Moore* of Mississippi, *Joseph P. Mazurek* of Montana, *Don Stenberg* of Nebraska, *Frankie Sue Del Papa* of Nevada, *Philip T. McLaughlin* of New Hampshire, *Peter Verniero* of New Jersey, *Tom Udall* of New Mexico, *Dennis C. Vacco* of New York, *Michael F. Easley* of North Carolina, *Robert B. Dunlap II* of the Northern Mariana Islands, *W. A. Drew Edmondson* of Oklahoma, *Hardy Myers* of Oregon, *D. Michael Fisher* of Pennsylvania, *Jose Fuentes-Agostini* of Puerto Rico, *Jeffrey B. Pine* of Rhode Island, *Charles M. Condon* of South Carolina, *Mark W. Barnett* of South Dakota, *John Knox Walkup* of Tennessee, *Dan Morales* of Texas, *William H. Sorrell* of Vermont, *Julio A. Brady* of the Virgin Islands, *Richard Cullen* of Virginia, *Christine O. Gregoire* of Washington, and *William U. Hill* of Wyoming.

Double Jeopardy Clause of the Fifth Amendment is not a bar to the later criminal prosecution because the administrative proceedings were civil, not criminal. Our reasons for so holding in large part disavow the method of analysis used in *United States* v. *Halper*, 490 U. S. 435, 448 (1989), and reaffirm the previously established rule exemplified in *United States* v. *Ward*, 448 U. S. 242, 248–249 (1980).

During the early and mid-1980's, petitioner John Hudson was the chairman and controlling shareholder of the First National Bank of Tipton (Tipton) and the First National Bank of Hammon (Hammon).[1] During the same period, petitioner Jack Rackley was president of Tipton and a member of the board of directors of Hammon, and petitioner Larry Baresel was a member of the board of directors of both Tipton and Hammon.

An examination of Tipton and Hammon led the Office of the Comptroller of the Currency (OCC) to conclude that petitioners had used their bank positions to arrange a series of loans to third parties in violation of various federal banking statutes and regulations. According to the OCC, those loans, while nominally made to third parties, were in reality made to Hudson in order to enable him to redeem bank stock that he had pledged as collateral on defaulted loans.

On February 13, 1989, OCC issued a "Notice of Assessment of Civil Money Penalty." The notice alleged that petitioners had violated 12 U. S. C. §§ 84(a)(1) and 375b (1982 ed.) and 12 CFR §§ 31.2(b) and 215.4(b) (1986) by causing the banks with which they were associated to make loans to nominee borrowers in a manner that unlawfully allowed Hudson to receive the benefit of the loans. App. to Pet. for Cert. 89a. The notice also alleged that the illegal loans resulted in losses to Tipton and Hammon of almost $900,000 and contributed to the failure of those banks. *Id.*, at 97a. However, the notice contained no allegation of any harm to the Govern-

---

[1] Tipton and Hammon are two very small towns in western Oklahoma.

ment as a result of petitioners' conduct. "After taking into account the size of the financial resources and the good faith of [petitioners], the gravity of the violations, the history of previous violations and other matters as justice may require, as required by 12 U. S. C. §§ 93(b)(2) and 504(b)," OCC assessed penalties of $100,000 against Hudson and $50,000 each against Rackley and Baresel. *Id.*, at 89a. On August 31, 1989, OCC also issued a "Notice of Intention to Prohibit Further Participation" against each petitioner. *Id.*, at 99a. These notices, which were premised on the identical allegations that formed the basis for the previous notices, informed petitioners that OCC intended to bar them from further participation in the conduct of "any insured depository institution." *Id.*, at 100a.

In October 1989, petitioners resolved the OCC proceedings against them by each entering into a "Stipulation and Consent Order." These consent orders provided that Hudson, Baresel, and Rackley would pay assessments of $16,500, $15,000, and $12,500 respectively. *Id.*, at 130a, 140a, 135a. In addition, each petitioner agreed not to "participate in any manner" in the affairs of any banking institution without the written authorization of the OCC and all other relevant regulatory agencies.[2] *Id.*, at 131a, 141a, 136a.

In August 1992, petitioners were indicted in the Western District of Oklahoma in a 22-count indictment on charges of conspiracy, 18 U. S. C. § 371, misapplication of bank funds, §§ 656 and 2, and making false bank entries, § 1005.[3] The violations charged in the indictment rested on the same lend-

---

[2] The consent orders also contained language providing that they did not constitute "a waiver of any right, power, or authority of any other representatives of the United States, or agencies thereof, to bring other actions deemed appropriate." App. to Pet. for Cert. 133a, 143a, 138a. The Court of Appeals ultimately held that this provision was not a waiver of petitioners' double jeopardy claim. 14 F. 3d 536, 539 (CA10 1994).

[3] Only petitioner Rackley was indicted for making false bank entries in violation of 18 U. S. C. § 1005.

ing transactions that formed the basis for the prior administrative actions brought by OCC. Petitioners moved to dismiss the indictment on double jeopardy grounds, but the District Court denied the motions. The Court of Appeals affirmed the District Court's holding on the nonparticipation sanction issue, but vacated and remanded to the District Court on the money sanction issue. 14 F. 3d 536 (CA10 1994). The District Court on remand granted petitioners' motion to dismiss the indictments. This time the Government appealed, and the Court of Appeals reversed. 92 F. 3d 1026 (1996). That court held, following *Halper*, that the actual fines imposed by the Government were not so grossly disproportional to the proved damages to the Government as to render the sanctions "punishment" for double jeopardy purposes. We granted certiorari, 520 U. S. 1165 (1997), because of concerns about the wide variety of novel double jeopardy claims spawned in the wake of *Halper*.[4] We now affirm, but for different reasons.

The Double Jeopardy Clause provides that no "person [shall] be subject for the same offence to be twice put in jeopardy of life or limb." We have long recognized that the Double Jeopardy Clause does not prohibit the imposition of

---

[4] *E. g., Zukas* v. *Hinson*, 1997 WL 623648 (CA11, Oct. 21, 1997) (challenge to FAA revocation of a commercial pilot's license as violative of double jeopardy); *E. B.* v. *Verniero*, 119 F. 3d 1077 (CA3 1997) (challenge to "Megan's Law" as violative of double jeopardy); *Jones* v. *Securities & Exchange Comm'n*, 115 F. 3d 1173 (CA4 1997) (challenge to SEC debarment proceeding as violative of double jeopardy); *United States* v. *Rice*, 109 F. 3d 151 (CA3 1997) (challenge to criminal drug prosecution following general military discharge for same conduct as violative of double jeopardy); *United States* v. *Hatfield*, 108 F. 3d 67 (CA4 1997) (challenge to criminal fraud prosecution as foreclosed by previous debarment from Government contracting); *Taylor* v. *Cisneros*, 102 F. 3d 1334 (CA3 1996) (challenge to eviction from federally subsidized housing based on guilty plea to possession of drug paraphernalia as violative of double jeopardy); *United States* v. *Galan*, 82 F. 3d 639 (CA5) (challenge to prosecution for prison escape following prison disciplinary proceeding as violative of double jeopardy), cert. denied, 519 U. S. 867 (1996).

all additional sanctions that could, " 'in common parlance,' " be described as punishment. *United States ex rel. Marcus* v. *Hess*, 317 U. S. 537, 549 (1943) (quoting *Moore* v. *Illinois*, 14 How. 13, 19 (1852)). The Clause protects only against the imposition of multiple *criminal* punishments for the same offense, *Helvering* v. *Mitchell*, 303 U. S. 391, 399 (1938); see also *Hess, supra,* at 548–549 ("Only" "criminal punishment" "subject[s] the defendant to 'jeopardy' within the constitutional meaning"); *Breed* v. *Jones*, 421 U. S. 519, 528 (1975) ("In the constitutional sense, jeopardy describes the risk that is traditionally associated with a criminal prosecution"), and then only when such occurs in successive proceedings, see *Missouri* v. *Hunter*, 459 U. S. 359, 366 (1983).

Whether a particular punishment is criminal or civil is, at least initially, a matter of statutory construction. *Helvering, supra,* at 399. A court must first ask whether the legislature, "in establishing the penalizing mechanism, indicated either expressly or impliedly a preference for one label or the other." *Ward*, 448 U. S., at 248. Even in those cases where the legislature "has indicated an intention to establish a civil penalty, we have inquired further whether the statutory scheme was so punitive either in purpose or effect," *id.,* at 248–249, as to "transfor[m] what was clearly intended as a civil remedy into a criminal penalty," *Rex Trailer Co.* v. *United States*, 350 U. S. 148, 154 (1956).

In making this latter determination, the factors listed in *Kennedy* v. *Mendoza-Martinez*, 372 U. S. 144, 168–169 (1963), provide useful guideposts, including: (1) "[w]hether the sanction involves an affirmative disability or restraint"; (2) "whether it has historically been regarded as a punishment"; (3) "whether it comes into play only on a finding of *scienter*"; (4) "whether its operation will promote the traditional aims of punishment—retribution and deterrence"; (5) "whether the behavior to which it applies is already a crime"; (6) "whether an alternative purpose to which it may rationally be connected is assignable for it"; and (7) "whether it appears

excessive in relation to the alternative purpose assigned."
It is important to note, however, that "these factors must be
considered in relation to the statute on its face," *id.*, at 169,
and "only the clearest proof" will suffice to override legisla-
tive intent and transform what has been denominated a civil
remedy into a criminal penalty, *Ward, supra*, at 249 (internal
quotation marks omitted).

Our opinion in *United States* v. *Halper* marked the first
time we applied the Double Jeopardy Clause to a sanction
without first determining that it was criminal in nature. In
that case, Irwin Halper was convicted of, *inter alia*, violating
the criminal false claims statute, 18 U. S. C. § 287, based on
his submission of 65 inflated Medicare claims each of which
overcharged the Government by $9. He was sentenced to
two years' imprisonment and fined $5,000. The Government
then brought an action against Halper under the civil False
Claims Act, 31 U. S. C. §§ 3729–3731 (1982 ed., Supp. II).
The remedial provisions of the False Claims Act provided
that a violation of the Act rendered one "liable to the United
States Government for a civil penalty of $2,000, an amount
equal to 2 times the amount of damages the Government
sustains because of the act of that person, and costs of the
civil action." *Id.*, § 3729. Given Halper's 65 separate viola-
tions of the Act, he appeared to be liable for a penalty of
$130,000, despite the fact he actually defrauded the Govern-
ment of less than $600. However, the District Court con-
cluded that a penalty of this magnitude would violate the
Double Jeopardy Clause in light of Halper's previous crimi-
nal conviction. While explicitly recognizing that the statu-
tory damages provision of the Act "was not itself a criminal
punishment," the District Court nonetheless concluded that
application of the full penalty to Halper would constitute a
second "punishment" in violation of the Double Jeopardy
Clause. 490 U. S., at 438–439.

On direct appeal, this Court affirmed. As the *Halper*
Court saw it, the imposition of "punishment" of any kind was

subject to double jeopardy constraints, and whether a sanction constituted "punishment" depended primarily on whether it served the traditional "goals of punishment," namely, "retribution and deterrence." *Id.*, at 448. Any sanction that was so "overwhelmingly disproportionate" to the injury caused that it could not "fairly be said *solely* to serve [the] remedial purpose" of compensating the Government for its loss, was thought to be explainable only as "serving either retributive or deterrent purposes." See *id.*, at 448–449 (emphasis added).

The analysis applied by the *Halper* Court deviated from our traditional double jeopardy doctrine in two key respects. First, the *Halper* Court bypassed the threshold question: whether the successive punishment at issue is a "criminal" punishment. Instead, it focused on whether the sanction, regardless of whether it was civil or criminal, was so grossly disproportionate to the harm caused as to constitute "punishment." In so doing, the Court elevated a single *Kennedy* factor—whether the sanction appeared excessive in relation to its nonpunitive purposes—to dispositive status. But as we emphasized in *Kennedy* itself, no one factor should be considered controlling as they "may often point in differing directions." 372 U. S., at 169. The second significant departure in *Halper*. was the Court's decision to "asses[s] the character of the actual sanctions imposed," 490 U. S., at 447, rather than, as *Kennedy* demanded, evaluating the "statute on its face" to determine whether it provided for what amounted to a criminal sanction, 372 U. S., at 169.

We believe that *Halper*'s deviation from longstanding double jeopardy principles was ill considered.[5]  As subsequent

---

[5] In his concurrence, JUSTICE STEVENS criticizes us for reexamining our *Halper* opinion rather than deciding the case on what he believes is the narrower *Blockburger* grounds.  But the question upon which we granted certiorari in this case is "whether imposition upon petitioners of monetary fines as *in personam* civil penalties by the Department of the Treasury, together with other sanctions, is 'punishment' for purposes of the Double

cases have demonstrated, *Halper*'s test for determining whether a particular sanction is "punitive," and thus subject to the strictures of the Double Jeopardy Clause, has proved unworkable. We have since recognized that all civil penalties have some deterrent effect. See *Department of Revenue of Mont.* v. *Kurth Ranch*, 511 U. S. 767, 777, n. 14 (1994); *United States* v. *Ursery*, 518 U. S. 267, 284–285, n. 2 (1996).[6] If a sanction must be "solely" remedial (*i. e.*, entirely nondeterrent) to avoid implicating the Double Jeopardy Clause, then no civil penalties are beyond the scope of the Clause. Under *Halper*'s method of analysis, a court must also look at the "sanction actually imposed" to determine whether the Double Jeopardy Clause is implicated. Thus, it will not be possible to determine whether the Double Jeopardy Clause is violated until a defendant has proceeded through a trial to judgment. But in those cases where the civil proceeding follows the criminal proceeding, this approach flies in the face of the notion that the Double Jeopardy Clause forbids the government from even "*attempting* a second time to punish criminally." *Helvering*, 303 U. S., at 399 (emphasis added).

Finally, it should be noted that some of the ills at which *Halper* was directed are addressed by other constitutional

---

Jeopardy Clause." Pet. for Cert. i. It is this question, and not the *Block-burger* issue, upon which there is a conflict among the Courts of Appeals. Indeed, the Court of Appeals for the Tenth Circuit in this case did not even pass upon the *Blockburger* question, finding it unnecessary to do so. 92 F. 3d, at 1028, n. 3.

[6] In *Kurth Ranch*, we held that the presence of a deterrent purpose or effect is not dispositive of the double jeopardy question. 511 U. S., at 781. Rather, we applied a *Kennedy*-like test, see 511 U. S., at 780–783, before concluding that Montana's dangerous drug tax was "the functional equivalent of a successive criminal prosecution," *id.*, at 784. Similarly, in *Ursery*, we rejected the notion that civil *in rem* forfeitures violate the Double Jeopardy Clause. 518 U. S., at 270–271. We upheld such forfeitures, relying on the historical support for the notion that such forfeitures are civil and thus do not implicate double jeopardy. *Id.*, at 292.

provisions. The Due Process and Equal Protection Clauses already protect individuals from sanctions which are downright irrational. *Williamson* v. *Lee Optical of Okla., Inc.,* 348 U. S. 483 (1955). The Eighth Amendment protects against excessive civil fines, including forfeitures. *Alexander* v. *United States,* 509 U. S. 544 (1993); *Austin* v. *United States,* 509 U. S. 602 (1993). The additional protection afforded by extending double jeopardy protections to proceedings heretofore thought to be civil is more than offset by the confusion created by attempting to distinguish between "punitive" and "nonpunitive" penalties.

Applying traditional double jeopardy principles to the facts of this case, it is clear that the criminal prosecution of these petitioners would not violate the Double Jeopardy Clause. It is evident that Congress intended the OCC money penalties and debarment sanctions imposed for violations of 12 U. S. C. §§ 84 and 375b to be civil in nature. As for the money penalties, both §§ 93(b)(1) and 504(a), which authorize the imposition of monetary penalties for violations of §§ 84 and 375b respectively, expressly provide that such penalties are "civil." While the provision authorizing debarment contains no language explicitly denominating the sanction as civil, we think it significant that the authority to issue debarment orders is conferred upon the "appropriate Federal banking agenc[ies]." §§ 1818(e)(1)–(3). That such authority was conferred upon administrative agencies is prima facie evidence that Congress intended to provide for a civil sanction. See *Helvering, supra,* at 402; *United States* v. *Spector,* 343 U. S. 169, 178 (1952) (Jackson, J., dissenting) ("Administrative determinations of liability to deportation have been sustained as constitutional only by considering them to be exclusively civil in nature, with no criminal consequences or connotations"); *Wong Wing* v. *United States,* 163 U. S. 228, 235 (1896) (holding that quintessential criminal punishments may be imposed only "by a judicial trial").

Turning to the second stage of the *Ward* test, we find that there is little evidence, much less the clearest proof that we require, suggesting that either OCC money penalties or debarment sanctions are "so punitive in form and effect as to render them criminal despite Congress' intent to the contrary." *Ursery, supra*, at 290. First, neither money penalties nor debarment has historically been viewed as punishment. We have long recognized that "revocation of a privilege voluntarily granted," such as a debarment, "is characteristically free of the punitive criminal element." *Helvering*, 303 U. S., at 399, and n. 2. Similarly, "the payment of fixed or variable sums of money [is a] sanction which ha[s] been recognized as enforcible by civil proceedings since the original revenue law of 1789." *Id.*, at 400.

Second, the sanctions imposed do not involve an "affirmative disability or restraint," as that term is normally understood. While petitioners have been prohibited from further participating in the banking industry, this is "certainly nothing approaching the 'infamous punishment' of imprisonment." *Flemming* v. *Nestor*, 363 U. S. 603, 617 (1960). Third, neither sanction comes into play "only" on a finding of scienter. The provisions under which the money penalties were imposed, 12 U. S. C. §§ 93(b) and 504, allow for the assessment of a penalty against any person "who violates" any of the underlying banking statutes, without regard to the violator's state of mind. "Good faith" is considered by OCC in determining the amount of the penalty to be imposed, § 93(b)(2), but a penalty can be imposed even in the absence of bad faith. The fact that petitioners' "good faith" was considered in determining the amount of the penalty to be imposed in this case is irrelevant, as we look only to "the statute on its face" to determine whether a penalty is criminal in nature. *Kennedy*, 372 U. S., at 169. Similarly, while debarment may be imposed for a "willful" disregard "for the safety or soundness of [an] insured depository institution,"

willfulness is not a prerequisite to debarment; it is sufficient that the disregard for the safety and soundness of the institution was "continuing." § 1818(e)(1)(C)(ii).

Fourth, the conduct for which OCC sanctions are imposed may also be criminal (and in this case formed the basis for petitioners' indictments). This fact is insufficient to render the money penalties and debarment sanctions criminally punitive, *Ursery*, 518 U. S., at 292, particularly in the double jeopardy context, see *United States* v. *Dixon*, 509 U. S. 688, 704 (1993) (rejecting "same-conduct" test for double jeopardy purposes).

Finally, we recognize that the imposition of both money penalties and debarment sanctions will deter others from emulating petitioners' conduct, a traditional goal of criminal punishment. But the mere presence of this purpose is insufficient to render a sanction criminal, as deterrence "may serve civil as well as criminal goals." *Ursery, supra*, at 292; see also *Bennis* v. *Michigan*, 516 U. S. 442, 452 (1996) ("[F]orfeiture . . . serves a deterrent purpose distinct from any punitive purpose"). For example, the sanctions at issue here, while intended to deter future wrongdoing, also serve to promote the stability of the banking industry. To hold that the mere presence of a deterrent purpose renders such sanctions "criminal" for double jeopardy purposes would severely undermine the Government's ability to engage in effective regulation of institutions such as banks.

In sum, there simply is very little showing, to say nothing of the "clearest proof " required by *Ward*, that OCC money penalties and debarment sanctions are criminal. The Double Jeopardy Clause is therefore no obstacle to their trial on the pending indictments, and it may proceed.

The judgment of the Court of Appeals for the Tenth Circuit is accordingly

*Affirmed.*

JUSTICE SCALIA, with whom JUSTICE THOMAS joins, concurring.

I wholly agree with the Court's conclusion that *Halper*'s test for whether a sanction is "punitive" was ill considered and unworkable. *Ante*, at 101–102. Indeed, it was the absurdity of trying to force the *Halper* analysis upon the Montana tax scheme at issue in *Department of Revenue of Mont. v. Kurth Ranch*, 511 U. S. 767 (1994), that prompted me to focus on the prior question whether the Double Jeopardy Clause even contains a multiple-punishments prong. See *id.*, at 802–803. That evaluation led me to the conclusion that the Double Jeopardy Clause prohibits successive prosecution, not successive punishment, and that we should therefore "put the *Halper* genie back in the bottle." *Id.*, at 803–805. Today's opinion uses a somewhat different bottle than I would, returning the law to its state immediately prior to *Halper*—which acknowledged a constitutional prohibition of multiple punishments but required successive criminal prosecutions. So long as that requirement is maintained, our multiple-punishments jurisprudence essentially duplicates what I believe to be the correct double jeopardy law, and will be as harmless in the future as it was pre-*Halper*. Accordingly, I am pleased to concur.

JUSTICE STEVENS, concurring in the judgment.

The maxim that "hard cases make bad law" may also apply to easy cases. As I shall explain, this case could easily be decided by the straightforward application of well-established precedent. Neither such a disposition, nor anything in the opinion of the Court of Appeals, would require a reexamination of the central holding in *United States v. Halper*, 490 U. S. 435 (1989), or of the language used in that unanimous opinion. Any proper concern about the danger that that opinion might be interpreted too expansively would be more appropriately addressed in a case that was either incorrectly decided or that at least raised a close or difficult

question.   In my judgment it is most unwise to use this case as a vehicle for the substitution of a rather open-ended attempt to define the concept of punishment for the portions of the opinion in *Halper* that trouble the Court.   Accordingly, while I have no hesitation about concurring in the Court's judgment, I do not join its opinion.

## I

As is evident from the first sentence of the Court's opinion, this is an extremely easy case.   It has been settled since the decision in *Blockburger* v. *United States,* 284 U. S. 299 (1932), that the Double Jeopardy Clause is not implicated simply because a criminal charge involves "essentially the same conduct" for which a defendant has previously been punished. See, *e. g., United States* v. *Dixon,* 509 U. S. 688, 696, 704 (1993); *Rutledge* v. *United States,* 517 U. S. 292, 297 (1996). Unless a second proceeding involves the "same offense" as the first, there is no double jeopardy.   The two proceedings at issue here involved different offenses that were not even arguably the same under *Blockburger.*

Under *Blockburger*'s "same-elements" test, two provisions are not the "same offense" if each contains an element not included in the other.   *Dixon,* 509 U. S., at 696.   The penalties imposed on the petitioners in 1989 were based on violations of 12 U. S. C. §§ 84(a)(1) and 375b (1982 ed.) and 12 CFR §§ 31.2(b) and 215.4(b) (1986).   Each of these provisions required proof that extensions of credit exceeding certain limits were made,[1] but did not require proof of an intent to defraud or the making of any false entries in bank records. The 1992 indictment charged violations of 18 U. S. C. §§ 371, 656, and 1005 and alleged a conspiracy to willfully misapply

---

[1] Title 12 U. S. C. § 84(a)(1) prohibits total loans and extensions of credit by a national banking association to any one borrower from exceeding 15 percent of the bank's unimpaired capital and surplus.   Title 12 U. S. C. § 375b and 12 CFR §§ 31.2(b) and 215.4(b) (1986) impose similar lending limits on loans to bank officers and other insiders.

bank funds and to make false banking entries, as well as the making of such entries; none of those charges required proof that any lending limit had been exceeded.

Thus, I think it would be difficult to find a case raising a double jeopardy claim that would be any easier to decide than this one.[2]

## II

The Court not only ignores the most obvious and straightforward basis for affirming the judgment of the Court of Appeals; it also has nothing to say about that court's explanation of why the reasoning in our opinion in *United States* v. *Halper* supported a rejection of petitioners' double jeopardy claim. Instead of granting certiorari to consider a possible error in the Court of Appeals' reasoning or its judgment, the Court candidly acknowledges that it was motivated by "concerns about the wide variety of novel double jeopardy claims spawned in the wake of *Halper*." *Ante*, at 98.

The Court's opinion seriously exaggerates the significance of those concerns. Its list of cases illustrating the problem cites seven cases decided in the last two years. *Ante*, at 98, n. 4. In every one of those cases, however, the Court of Appeals *rejected* the double jeopardy claim. The only ruling by any court favorable to any of these "novel" claims was a preliminary injunction entered by a District Court postponing implementation of New Jersey's novel, controversial

---

[2] Petitioners challenge this conclusion by relying on dicta from *Kansas* v. *Hendricks*, 521 U. S. 346, 370 (1997). There, after rejecting a double jeopardy challenge to Kansas' Sexually Violent Predator Act, the Court added: "The *Blockburger* test, however, simply does not apply outside of the successive prosecution context." *Ibid.* This statement, pure dictum, was unsupported by any authority and contradicts the earlier ruling in *United States* v. *Dixon*, 509 U. S. 688, 704–705 (1993), that the *Blockburger* analysis applies to claims of successive punishment as well as successive prosecution. See also 509 U. S., at 745–746 (SOUTER, J., concurring in judgment in part and dissenting in part) (explaining why the *Blockburger* test applies in the multiple punishments context). I cannot imagine a good reason why *Blockburger* should not apply here.

"Megan's Law." *E. B.* v. *Poritz*, 914 F. Supp. 85 (NJ 1996), rev'd, *E. B.* v. *Verniero*, 119 F. 3d 1077 (CA3 1997). Thus, the cases cited by the Court surely do not indicate any need to revisit *Halper*.

The Court also claims that two practical flaws in the *Halper* opinion warrant a prompt adjustment in our double jeopardy jurisprudence. First, the Court asserts that *Halper*'s test is unworkable because it permits only successive sanctions that are "solely" remedial. *Ante*, at 102. Though portions of *Halper* were consistent with such a reading, the express statement of its holding was much narrower.[3] Of greater importance, the Court has since clarified this very point:

> "Whether a particular sanction 'cannot fairly be said *solely* to serve a remedial purpose' is an inquiry radically different from that we have traditionally employed in order to determine whether, as a categorical matter, a civil sanction is subject to the Double Jeopardy Clause. Yet nowhere in *Halper* does the Court purport to make such a sweeping change in the law, instead emphasizing repeatedly the narrow scope of its decision." *United States* v. *Ursery*, 518 U. S. 267, 285, n. 2 (1996).

Having just recently emphasized *Halper*'s narrow rule in *Ursery*, it is quite odd for the Court now to suggest that its overbreadth has created some sort of judicial emergency.

Second, the Court expresses the concern that when a civil proceeding follows a criminal punishment, *Halper* would require a court to wait until judgment is imposed in the successive proceeding before deciding whether the latter sanction violates double jeopardy. *Ante*, at 102. That concern is

---

[3] "We . . . hold that under the Double Jeopardy Clause a defendant who already has been punished in a criminal prosecution may not be subjected to an additional civil sanction to the extent that the second sanction may not fairly be characterized as remedial, but only as a deterrent or retribution." *United States* v. *Halper*, 490 U. S. 435, 448–449 (1989).

wholly absent in this case, however, because the criminal indictment followed administrative sanctions. There can be no doubt that any fine or sentence imposed on the criminal counts would be "punishment." If the indictment charged the same offense for which punishment had already been imposed, the prosecution itself would be barred by the Double Jeopardy Clause no matter how minor the criminal sanction sought in the second proceeding.

Thus, the concerns that the Court identifies merely emphasize the accuracy of the comment in *Halper* itself that it announced "a rule for the rare case . . . where a fixed-penalty provision subjects a prolific but small-gauge offender to a sanction overwhelmingly disproportionate to the damages he has caused." 490 U. S., at 449.

## III

Despite my disagreement with the Court's decision to use this case as a rather lame excuse for writing a gratuitous essay about punishment, I do agree with its reaffirmation of the central holding of *Halper* and *Department of Revenue of Mont.* v. *Kurth Ranch*, 511 U. S. 767 (1994). Both of those cases held that sanctions imposed in civil proceedings constituted "punishment" barred by the Double Jeopardy Clause.[4] Those holdings reconfirmed the settled proposition that the Government cannot use the "civil" label to escape entirely the Double Jeopardy Clause's command, as we have recognized for at least six decades. See *United States* v. *La Franca*, 282 U. S. 568, 574–575 (1931); *Helvering* v. *Mitchell*, 303 U. S. 391, 398–399 (1938). That proposition is extremely

---

[4] Other recent double jeopardy decisions have also recognized that double jeopardy protection is not limited to multiple prosecutions. See *United States* v. *Ursery*, 518 U. S. 267, 273 (1996); *Kansas* v. *Hendricks*, 521 U. S., at 369. Otherwise, it would have been totally unnecessary to determine whether the civil forfeitures in *Ursery* and the involuntary civil commitment in *Hendricks* imposed "punishment" for double jeopardy purposes, for neither sanction was implemented via criminal proceedings.

important because the States and the Federal Government have an enormous array of civil administrative sanctions at their disposal that are capable of being used to punish persons repeatedly for the same offense, violating the bedrock double jeopardy principle of finality. "The underlying idea, one that is deeply ingrained in at least the Anglo-American system of jurisprudence, is that the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity . . . ." *Green* v. *United States*, 355 U. S. 184, 187 (1957). However the Court chooses to recalibrate the meaning of punishment for double jeopardy purposes, our doctrine still limits multiple sanctions of the rare sort contemplated by *Halper*.

## IV

Today, as it did in *Halper* itself, the Court relies on the sort of multifactor approach to the definition of punishment that we used in *Kennedy* v. *Mendoza-Martinez*, 372 U. S. 144, 168–169 (1963), to identify situations in which a civil sanction is punitive. Whether the Court's reformulation of *Halper*'s test will actually affect the outcome of any cases remains to be seen. Perhaps it will not, since the Court recommends consideration of whether a sanction's "'operation will promote the traditional aims of punishment—retribution and deterrence,'" and "'whether it appears excessive in relation to the alternative [nonpunitive] purpose assigned.'" *Ante*, at 99–100 (quoting *Kennedy*, 372 U. S., at 168–169). Those factors look awfully similar to the reasoning in *Halper*, and while we are told that they are never by themselves dispositive, *ante*, at 101, they should be capable of tipping the balance in extreme cases. The danger in changing approaches midstream, rather than refining our established approach on an incremental basis, is that the Government and lower

courts may be unduly influenced by the Court's new attitude, rather than its specific prescribed test.

It is, of course, entirely appropriate for the Court to perform a lawmaking function as a necessary incident to its Article III responsibility for the decision of "Cases" and "Controversies." In my judgment, however, a desire to reshape the law does not provide a legitimate basis for issuing what amounts to little more than an advisory opinion that, at best, will have the precedential value of pure dictum and may in time unduly restrict the protections of the Double Jeopardy Clause. "It is not the habit of the Court to decide questions of a constitutional nature unless absolutely necessary to a decision of the case." *Burton* v. *United States*, 196 U. S. 283, 295 (1905); see also *Ashwander* v. *TVA*, 297 U. S. 288, 345–348 (1936) (Brandeis, J., concurring). Accordingly, while I concur in the judgment of affirmance, I do not join the Court's opinion.

JUSTICE SOUTER, concurring in the judgment.

I concur in the Court's judgment and with much of its opinion. As the Court notes, *ante*, at 102, we have already recognized that *Halper*'s statements of standards for identifying what is criminally punitive under the Fifth Amendment needed revision, *United States* v. *Ursery*, 518 U. S. 267, 284–285, n. 2 (1996), and there is obvious sense in employing common criteria to point up the criminal nature of a statute for purposes of both the Fifth and Sixth Amendments. See *United States* v. *One Assortment of 89 Firearms*, 465 U. S. 354, 362–366 (1984); *United States* v. *Ward*, 448 U. S. 242, 248–249 (1980); *Kennedy* v. *Mendoza-Martinez*, 372 U. S. 144, 168–169 (1963); see also *Ward, supra,* at 254 ("[I]t would be quite anomalous to hold that [the statute] created a criminal penalty for the purposes of the Self-Incrimination Clause but a civil penalty for all other purposes").

Applying the Court's *Kennedy-Ward* criteria leads me directly to the conclusion of JUSTICE STEVENS's opinion con-

curring in the judgment. The fifth criterion calls for a court to determine whether "the behavior to which [the penalty] applies is already a crime." *Kennedy* v. *Mendoza-Martinez, supra,* at 168–169. The efficient starting point for identifying constitutionally relevant "behavior," when considering an objection to a successive prosecution, is simply to apply the same-elements test as originally stated in *Blockburger* v. *United States,* 284 U. S. 299 (1932). See *United States* v. *Dixon,* 509 U. S. 688 (1993). When application of *Blockburger* under *Kennedy-Ward* shows that a successive prosecution is permissible even on the assumption that each penalty is criminal, the issue is necessarily settled. Such is the case here, as JUSTICE STEVENS explains. See *ante,* at 107 (opinion concurring in judgment). Applying the *Kennedy-Ward* criteria, therefore, I would stop just where JUSTICE STEVENS stops.

My acceptance of the *Kennedy-Ward* analytical scheme is subject to caveats, however. As the Court points out, under *Ward,* once it is understood that a legislature intended a penalty to be treated as civil in character, that penalty may be held criminal for Fifth Amendment purposes (and, for like reasons, under the Sixth Amendment) only on the "clearest proof" of its essentially criminal proportions. While there are good and historically grounded reasons for using that phrase to impose a substantial burden on anyone claiming that an apparently civil penalty is in truth criminal, what may be clear enough to be "clearest" is necessarily dependent on context, as indicated by the cases relied on as authority for adopting the standard in *Ward. Flemming* v. *Nestor,* 363 U. S. 603 (1960), used the quoted language to describe the burden of persuasion necessary to demonstrate a criminal and punitive purpose unsupported by "objective manifestations" of legislative intent. *Id.,* at 617. *Rex Trailer Co.* v. *United States,* 350 U. S. 148, 154 (1956), cited as secondary authority, required a defendant to show that a "measure of recovery" was "unreasonable or excessive" before "what was

clearly intended as a civil remedy [would be treated as] a criminal penalty." *One Lot Emerald Cut Stones* v. *United States*, 409 U. S. 232, 237 (1972) *(per curiam)*, cited *Rex Trailer* for that standard and relied on the case as exemplifying a provision for liquidated damages as distinct from criminal penalty. I read the requisite "clearest proof" of criminal character, then, to be a function of the strength of the countervailing indications of civil nature (including the presumption of constitutionality enjoyed by an ostensibly civil statute making no provision for the safeguards guaranteed to criminal defendants. See *Flemming, supra,* at 617).

I add the further caution, to be wary of reading the "clearest proof" requirement as a guarantee that such a demonstration is likely to be as rare in the future as it has been in the past. See *United States* v. *Halper,* 490 U. S. 435, 449 (1989) ("What we announce now is a rule for the rare case"). We have noted elsewhere the expanding use of ostensibly civil forfeitures and penalties under the exigencies of the current drug problems, see *Ursery, supra,* at 300 (STEVENS, J., concurring in judgment in part and dissenting in part) ("In recent years, both Congress and the state legislatures have armed their law enforcement authorities with new powers to forfeit property that vastly exceed their traditional tools"); *United States* v. *James Daniel Good Real Property,* 510 U. S. 43, 81–82 (1993) (THOMAS, J., concurring in part and dissenting in part), a development doubtless spurred by the increasingly inviting prospect of its profit to the Government. See *id.,* at 56, n. 2 (opinion of the Court) (describing the Government's financial stake in drug forfeiture); see also *id.,* at 56 (citing *Harmelin* v. *Michigan,* 501 U. S. 957, 979, n. 9 (1991) (opinion of SCALIA, J.) for the proposition that "it makes sense to scrutinize governmental action more closely when the State stands to benefit"). Hence, on the infrequency of "clearest proof," history may not be repetitive.

JUSTICE BREYER, with whom JUSTICE GINSBURG joins, concurring in the judgment.

I agree with the majority and with JUSTICE SOUTER that *United States* v. *Halper*, 490 U. S. 435 (1989), does not provide proper guidance for distinguishing between criminal and noncriminal sanctions and proceedings. I also agree that *United States* v. *Ward*, 448 U. S. 242, 248 (1980), and *Kennedy* v. *Mendoza-Martinez*, 372 U. S. 144, 168–169 (1963), set forth the proper approach.

I do not join the Court's opinion, however, because I disagree with its reasoning in two respects. First, unlike the Court I would not say that "'only the clearest proof '" will "transform" into a criminal punishment what a legislature calls a "civil remedy." *Ante,* at 100. I understand that the Court has taken this language from earlier cases. See *Ward, supra,* at 249. But the limitation that the language suggests is not consistent with what the Court has actually done. Rather, in fact if not in theory, the Court has simply applied factors of the *Kennedy* variety to the matter at hand. In *Department of Revenue of Mont.* v. *Kurth Ranch,* 511 U. S. 767 (1994), for example, the Court held that the collection of a state tax imposed on the possession and storage of drugs was "the functional equivalent of a successive criminal prosecution" because, among other things, the tax was "remarkably high"; it had "an obvious deterrent purpose"; it was "conditioned on the commission of a crime"; it was "exacted only after the taxpayer ha[d] been arrested for the precise conduct that gives rise to the tax obligation"; its alternative function of raising revenue could be equally well served by increasing the fine imposed on the activity; and it departed radically from "normal revenue laws" by taxing contraband goods perhaps destroyed before the tax was imposed. *Id.,* at 781–784. This reasoning tracks the nonexclusive list of factors set forth in *Kennedy,* and it is, I believe, the proper approach. The "clearest proof" language

is consequently misleading, and I would consign it to the same legal limbo where *Halper* now rests.

Second, I would not decide now that a court should evaluate a statute only " 'on its face,' " *ante,* at 100 (quoting *Kennedy, supra,* at 169), rather than "assessing the character of the actual sanctions imposed," *Halper, supra,* at 447; *ante,* at 101. *Halper* involvéd an ordinary civil-fine statute that as normally applied would not have created any "double jeopardy" problem. It was not the statute itself, but rather the disproportionate relation between fine and conduct as the statute was applied in the individual case that led this Court, unanimously, to find that the "civil penalty" was, in those circumstances, a second "punishment" that constituted double jeopardy. See 490 U. S., at 439, 452 (finding that $130,000 penalty was "sufficiently disproportionate" to $585 loss plus approximately $16,000 in Government expenses caused by Halper's fraud to constitute a second punishment in violation of double jeopardy). Of course, the Court in *Halper* might have reached the same result through application of the constitutional prohibition of "excessive fines." See *ante,* at 103; *Alexander* v. *United States,* 509 U. S. 544, 558–559 (1993); *Halper, supra,* at 449 (emphasizing that *Halper* was "the rare case" in which there was an "over-whelmingly disproportionate" fine). But that is not what the Court there said. And nothing in the majority's opinion today explains *why* we should abandon this aspect of *Halper*'s holding. Indeed, in context, the language of *Kennedy* that suggests that the Court should consider the statute on its face does not suggest that there may not be further analysis of a penalty as it is applied in a particular case. See 372 U. S., at 169. Most of the lower court confusion and criticism of *Halper* appears to have focused on the problem of characterizing—by examining the face of the statute—the purposes of a civil penalty as punishment, not on the application of double jeopardy analysis to the penalties that are imposed in particular cases. It seems to me quite possible that

a statute that provides for a punishment that normally is civil in nature could nonetheless amount to a criminal punishment as applied in special circumstances. And I would not now hold to the contrary.

That said, an analysis of the *Kennedy* factors still leads me to the conclusion that the statutory penalty in this case is not on its face a criminal penalty. Nor, in my view, does the application of the statute to the petitioners in this case amount to criminal punishment. I therefore concur in the judgment.