# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

DAVID WAYNE BREWER,
             *Plaintiff-Appellant,*

v.

HORACE M. KIMEL, JR., District
Attorney for the Eighteenth Judicial
District, Guilford County,
             *Defendant-Appellee.*

No. 00-2151

Appeal from the United States District Court
for the Middle District of North Carolina, at Durham.
James A. Beaty, Jr., District Judge.
(CA-99-892-1)

Argued: April 3, 2001

Decided: July 5, 2001

Before WILKINSON, Chief Judge, WILLIAMS, Circuit Judge,
and Frederic N. SMALKIN, United States District Judge
for the District of Maryland, sitting by designation.

_____

Affirmed by published opinion. Judge Williams wrote the opinion, in
which Chief Judge Wilkinson and Judge Smalkin joined.

_____

## COUNSEL

**ARGUED:** Seth R. Cohen, SMITH, JAMES, ROWLETT &
COHEN, L.L.P., Greensboro, North Carolina, for Appellant. Stacey
Treva Carter, Assistant Attorney General, NORTH CAROLINA

DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellee. **ON BRIEF:** Walter L. Jones, CLIFFORD, CLENDENIN, O'HALE & JONES, L.L.P., Greensboro, North Carolina, for Appellant. Isaac T. Avery, III, Special Deputy Attorney General, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellee.

---

## OPINION

WILLIAMS, Circuit Judge:

In this case, David Wayne Brewer seeks to enjoin Horace M. Kimel, Jr., the District Attorney for the Eighteenth Judicial District of North Carolina, from prosecuting him for the offense of driving while impaired in violation of N.C. Gen. Stat. § 20-138.1 (1999). Brewer contends that North Carolina's prior imposition of a thirty-day period of administrative license revocation (ALR) constitutes a criminal punishment within the meaning of the Double Jeopardy Clause of the Fifth Amendment, U.S. Const. Amend. V, and bars his prosecution on the instant charges. Because the evidence adduced by Brewer does not provide the "clearest proof" that North Carolina's thirty-day ALR is so punitive in purpose or effect that it amounts to a criminal sanction, we affirm the district court's grant of summary judgment in Kimel's favor.

I.

A.

The underlying facts in this case are not in dispute. Brewer was charged on July 22, 1999, with driving while impaired in violation of N.C. Gen. Stat. § 20-138-1 (1999). After submitting to intoxilizer tests pursuant to North Carolina law, Brewer registered a blood alcohol level of .08. Pursuant to N.C. Gen. Stat. § 20-16.5 (1999), the magistrate who processed Brewer for the criminal charge revoked his driver's license for thirty days. Pursuant to N.C. Gen. Stat. § 20-16.5(g), Brewer had the right to request a hearing to contest the validity of his revocation; it is unclear whether he did so. After ten days,

Brewer had the opportunity to petition for limited driving privileges pursuant to N.C. Gen. Stat. § 20-16.5(p); the record does not indicate whether Brewer requested or received such privileges. On August 23, 1999, Brewer paid the $50 restoration fee as required by law, and his license was returned by the State of North Carolina. Brewer's criminal case has been continued in the North Carolina state courts as this case has progressed, and he has not yet been tried criminally for driving while impaired.

## B.

Brewer filed his complaint on October 12, 1999, seeking injunctive relief pursuant to 42 U.S.C.A. § 1983 (West 2000) to vindicate his right under the Double Jeopardy Clause of the United States Constitution not to be subjected to multiple criminal punishments for the same offense. On December 9, 1999, Kimel filed a motion to dismiss or in the alternative for summary judgment; on February 1, 2000, Brewer filed a motion for summary judgment. On August 18, 2000, the district court granted summary judgment in favor of Kimel and denied Brewer's motion for summary judgment.[1] The district court concluded that North Carolina's ALR program did not constitute criminal punishment within the meaning of the Double Jeopardy Clause.

## II.

The sole issue on appeal is whether North Carolina's thirty-day ALR period amounts to criminal punishment, triggering the protections of the Double Jeopardy Clause. U.S. Const. Amend. V. We

---

[1]The district court found that Brewer's suit was not barred by the Eleventh Amendment because the doctrine of *Ex parte Young*, 209 U.S. 123, 155-56 (1908), permits suits against state officials which seek solely to enjoin continuing or future violations of federal law. Further, the district court held that *Younger v. Harris*, 401 U.S. 37 (1971), which ordinarily bars federal courts from enjoining pending state criminal proceedings, did not apply. *See Gilliam v. Foster*, 75 F.3d 881, 903-04 (4th Cir. 1996) (noting that because the Double Jeopardy Clause provides protection against being tried twice for the same offense, "a portion of the constitutional protection it affords would be irreparably lost" if such claims could be raised only after the termination of state criminal proceedings).

review the district court's grant of summary judgment denying a double jeopardy claim *de novo*. *United States v. Imngren*, 98 F.3d 811, 813 (4th Cir. 1996).

N.C. Gen. Stat. § 20-16.5 (1999), entitled "Immediate civil license revocation for certain persons charged with implied-consent offenses," provides for a thirty-day revocation of the driver's license of a person charged with an implied-consent offense who either refuses a blood alcohol level (BAC) test or consents to such a test and has an alcohol concentration in excess of the applicable legal limit (.08 ordinarily). N.C. Gen. Stat. § 20-16.5(b)(4). The statute provides that the charging officer must execute a revocation report and file it with the appropriate state trial court, which upon finding probable cause to believe that the statutory requirements have been met, shall revoke the driver's license. N.C. Gen. Stat. § 20-16.5.

In *Halper v. United States*, 490 U.S. 435 (1989), *abrogated by Hudson v. United States*, 522 U.S. 93, 101 (1997), the Supreme Court adopted a broad reading of the Double Jeopardy Clause which made it substantially easier to attack repetitive punishments as violative of the Clause. The *Halper* Court began by noting that "the Double Jeopardy Clause protects against three distinct abuses: a second prosecution for the same offense after acquittal; a second prosecution for the same offense after conviction; and multiple punishments for the same offense." *Id.* at 440 (citing *North Carolina v. Pearce*, 395 U.S. 711, 717 (1969)). Rather than examining whether multiple *criminal* punishments were involved in the case before it, the *Halper* Court suggested that "in a particular case a civil penalty . . . may be so extreme and so divorced from the Government's damages as expenses as to constitute punishment." *Id.* at 442. The Court interpreted the Double Jeopardy Clause to prohibit not only successive criminal punishments, but "merely punishing twice," *id.* at 443 (internal quotation marks omitted), and proceeded to hold that "a civil sanction that cannot fairly be said solely to serve a remedial purpose, but rather can only be explained as also serving either retributive or deterrent purposes, is punishment," and "under the Double Jeopardy Clause a defendant who already has been punished in a criminal prosecution may not be subjected to an additional civil sanction to the extent that the second sanction may not fairly be characterized as remedial, but only as a deterrent or retribution." *Id.* at 448-49. The Court found that

in the case before it, sanctions levied under the civil False Claims Act were entirely disproportionate to the real injury to the Government and could only be explained as a punitive sanction. The Court announced that its holding was "a rule for the rare case, the case such as the one before us, where a fixed-penalty provision subjects a prolific but small-gauge offender to a sanction overwhelmingly disproportionate to the damages he has caused." *Id.* at 449.

Eight years later, in *Hudson v. United States*, 522 U.S. 93 (1997), the Court substantially curtailed the *Halper* approach, expressing "concerns about the wide variety of novel double jeopardy claims spawned in the wake of *Halper*," *id.* at 98, and concluding that "*Halper*'s deviation from longstanding double jeopardy principles was ill considered," *id.* at 101. Rejecting *Halper*'s emphasis on whether repetitive "punishment" exists irrespective of whether such punishment is civil or criminal in nature, the *Hudson* Court stated, "[w]e have long recognized that the Double Jeopardy Clause does not prohibit the imposition of all additional sanctions that could, 'in common parlance,' be described as punishment. The Clause protects only against the imposition of multiple *criminal* punishments for the same offense." *Id.* at 98-99 (internal citations omitted). Rather than making the existence of "punishment" determinative, the *Hudson* Court focused on the criminal or civil character of the sanction, noting that *Halper* "marked the first time we applied the Double Jeopardy Clause to a sanction without first determining that it was criminal in nature." *Id.* at 100. This criminal/civil determination "is, at least initially, a matter of statutory construction." *Id.* at 99. However, the intent of the legislature to denominate a punishment as civil is not determinative; the *Hudson* Court stated that courts should "inquire[ ] further whether the statutory scheme was so punitive either in purpose or effect, as to transform what was clearly intended as a civil remedy into a criminal penalty." *Id.* (internal quotation marks and citation omitted).

In determining whether a punishment labeled as civil is in reality criminal for Double Jeopardy purposes, the *Hudson* Court applied the seven-factor test adopted by *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168-69 (1963), the vitality of which had been called into question by *Halper*'s more direct analytical approach. The seven-factor *Kennedy/Hudson* test asks:

(1) [w]hether the sanction involves an affirmative disability or restraint; (2) whether it has historically been regarded as a punishment; (3) whether it comes into play only on a finding of *scienter*; (4) whether its operation will promote the traditional aims of punishment — retribution and deterrence; (5) whether the behavior to which it applies is already a crime; (6) whether an alternative purpose to which it may rationally be connected is assignable for it; and (7) whether it appears excessive in relation to the alternative purpose assigned.

*Hudson*, 522 U.S. at 99-100 (quoting *Kennedy*, 372 U.S. at 168-69) (internal quotation marks omitted).

In applying these factors, "only the clearest proof will suffice to override legislative intent and transform what has been denominated a civil remedy into a criminal penalty." *Id.* at 100 (internal quotation marks omitted); *see also Seling v. Young*, 121 S.Ct. 727, 734 (2001) (reaffirming the *Hudson* approach and the "clearest proof" requirement). The *Hudson* Court noted further that since all civil penalties have some deterrent effect, *Halper*'s rule would be unworkable to the extent that it held that if *any* portion of a civil sanction is explicable only in punitive terms, the sanction as a whole is punitive. *Hudson*, 522 U.S. at 102. We will proceed by first examining whether North Carolina's purpose in enacting the thirty-day ALR period was to impose a criminal punishment and then turn to an examination of the seven *Hudson* factors.

### A.

North Carolina (the "State") argues that the evidence indicates that its thirty-day ALR provision was intended as a civil, remedial sanction and not as punishment. The State observes first that N.C. Gen. Stat. § 20-16.5 is facially labeled as a "civil" sanction. As the criminal/civil determination is "at least initially, a matter of statutory construction," *Hudson*, 522 U.S. at 99, this is persuasive, though not conclusive, evidence that the purpose of § 20-16.5 is to impose a civil sanction and not a criminal punishment. The State next argues that studies show a reduction in drunk driving of up to 9 percent as a result of ALR periods, and thus, the ALR provision is demonstrably reme-

dial. In any event, the State notes, the North Carolina Supreme Court has twice concluded that the legislature intended § 20-16.5, in its original, ten-day form, to be a civil, remedial sanction.[2] *See State v. Oliver*, 470 S.E.2d 16, 20 (N.C. 1996); *Henry v. Edmisten*, 340 S.E.2d 720, 733 (N.C. 1986). Because federal courts must follow a state supreme court's constructions of a state statute, *see Johnson v. Fankell*, 520 U.S. 911, 916 (1997), the State argues that *Oliver* and *Henry* are conclusive as to the issue of whether the legislature intended N.C. Gen. Stat. § 20-16.5 to be punitive legislation.[3]

Brewer argues, on the other hand, that the legislative history of § 20-16.5 demonstrates that it was intended to serve as punishment; Brewer points to a legislative commentary prepared by the Institute of Government at the University of North Carolina which stated of the original, ten-day ALR provision:

> This provision serves a couple of functions important to the Governor and the proponents of the bill. First, it provides an immediate "slap in the face" to virtually all drivers charged with DWI. Second, the fact that it is imposed independent of the trial on the criminal charge makes it more certain that a sanction will be imposed, regardless of the defendant's status or his lawyer's expertise.

---

[2]N.C. Gen. Stat. § 20-16.5, as originally enacted, provided for a 10-day ALR period. *State v. Oliver*, 470 S.E.2d 16, 20 (N.C. 1996). In 1997, the North Carolina Legislature extended § 20-16.5's ALR period to 30 days and provided for the restoration of limited driving privileges upon the driver's petition and after certain conditions are met. *See* N.C. Gen. Stat. § 20-16.5.

[3]Of course, these cases address the legislature's purpose in enacting the original, 10-day ALR period, rather than the legislature's intent in lengthening the period to 30 days, a topic on which the North Carolina appellate courts have not ruled. Even if the legislature did not intend § 20-16.5 to be punitive, this Court must "inquire[ ] further whether the statutory scheme [is] so punitive either in purpose or effect as to transfor[m] what was clearly intended as a civil remedy into a criminal penalty." *Hudson v. United States*, 522 U.S. 93, 99 (1997) (internal quotation marks and citation omitted).

*Oliver*, 470 S.E.2d at 20. While the substance of these comments is troubling insofar as it hints at an intention to circumvent the process of adjudicating guilt prior to imposing sanctions, the document to which Brewer points is an academic commentary on the bill; it is not at all clear that this commentary is competent legislative history evidence at all. Further, the North Carolina courts have repeatedly considered this commentary, along with the rest of the legislative history surrounding the original, ten-day version of § 20-16.5, and concluded that the ten-day provision was not, on balance, intended to be punitive. *See Oliver*, 470 S.E.2d at 20; *Henry*, 340 S.E.2d at 734.

Brewer also argues that a 1996 report of a gubernatorial commission which recommended lengthening the ALR period establishes that the *lengthening* of the period was intended to be punitive; this report indicates that the longer period was intended to be a "deterrent" and an "inconvenience." (J.A. at 67.) We note, however, that this report recommended a ninety-day ALR and the legislature only enacted a thirty-day ALR, suggesting that the legislature's motives may have been less punitive than the motives of the Governor. Additionally, the Supreme Court has held that civil penalties may have some deterrent effect without being rendered punitive or criminal in nature. *Hudson*, 522 U.S. at 101.

Brewer further points to various press releases from the Governor's office announcing developments related to the bill which included the increase in the ALR period from ten to thirty days; these press releases use language indicative of a punitive goal, such as the statement that the legislation "cracks down" on DWI offenders. (J.A. at 68-70.) Brewer argues that these public statements regarding the legislation, which included the ALR extension, coupled with the clearly punitive nature of other components of the legislation (such as mandatory one-year jail terms for repeat offenders), evidence a punitive purpose. The difficulty with this approach is that the fact that the thirty-day ALR provision was enacted as part of a bill that included punitive components cannot possibly make the provision punitive; if this were so, the application of the Double Jeopardy Clause would turn on formalisms related to how legislative bodies decide to package various legislative provisions. Moreover, the general, "cracking down" language in the press releases Brewer cites might just as well refer to the clearly punitive portions of the larger bill at issue. We thus

conclude that Brewer cannot show, based on the legislative history, that § 20-16.5 was intended to be either punitive or criminal in nature. Therefore, the appropriate inquiry is whether, under the seven-factor *Hudson* approach, the thirty-day ALR period constitutes criminal punishment so as to trigger the applicability of the Double Jeopardy Clause. *Hudson*, 522 U.S. at 99.

## B.

Having concluded that Brewer cannot show that the State intended the thirty-day ALR period to be a criminal punishment, we now will examine the evidence adduced as to each of the seven *Hudson* factors in order to determine whether Brewer has presented the "clearest proof" that North Carolina's thirty-day ALR period is in fact a criminal punishment.

### 1. *Affirmative Disability or Restraint*

Noting that we live in a highly mobile society and that in light of the unavailability of mass transit, driving is the only feasible means of transportation in many areas, Brewer contends that the thirty-day ALR amounts to an "affirmative disability or restraint" within the meaning of *Hudson*. The State, on the other hand, argues that a driver's license is a privilege, not a right, and the revocation of a privilege for noncompliance with the conditions of the privilege cannot as a matter of law constitute an "affirmative disability or restraint." The *Hudson* Court held that a prohibition on participation in the banking industry was not an "affirmative disability or restraint," noting that this "is certainly nothing approaching the 'infamous punishment' of imprisonment." *Hudson*, 522 U.S. at 104 (internal quotation marks omitted). Certainly the practical impact of losing one's driver's license is severe; so, too, however, is the impact of an indefinite prohibition on employment in the banking industry on an individual who has built a lifetime career in that industry, which *Hudson* held not to involve an affirmative disability. Given that *Hudson* stated that "revocation of a privilege voluntarily granted . . . is characteristically free of the punitive criminal element," *id.*, and given also that *Hudson*'s comparison point for determining whether a sanction involves an "affirmative disability" was the "infamous punishment of imprisonment,"

we conclude that revocation of a driver's license does not involve an "affirmative disability."[4]

## 2. *Historically Regarded as Punishment*

Brewer argues that license revocation is commonly used in North Carolina as a form of criminal punishment and thus, is "historically regarded" as criminal punishment. (Brief of Appellant at 20-21.) The State counters that the revocation of a privilege has historically not been regarded as criminal punishment. We find the analysis of *Oliver*, 470 S.E.2d at 20, to be persuasive on this point. *Oliver* cites North Carolina cases dating back to 1956 which directly hold that driver's license revocation is not punitive in nature. *See id.*; *State v. Carlisle*, 204 S.E.2d 15, 16 (N.C. 1974) ("[T]he purpose of a [driver's license] revocation proceeding is not to punish the offender, but to remove from the highway one who is a potential danger to himself and other travelers."); *Harrell v. Scheidt*, 92 S.E.2d 182, 185 (N.C. 1956) ("[T]he revocation of a license to operate a motor vehicle is not a part of, nor within the limits of punishment to be fixed by the court, wherein the offender is tried.").

## 3. *Requirement of Scienter*

Brewer argues that N.C. Gen. Stat. § 20-16.5 requires a finding of scienter because scienter is implicit in committing the crime of driving while impaired. But, as the State observes, driving while impaired is a strict liability offense; one is guilty simply by virtue of operating a motor vehicle with a blood alcohol level higher than the legal limit, and there is no requirement that the state prove any *mens rea* as to intoxication as an element of the offense. *See*, *e.g.*, *State v. Hill*, 230 S.E.2d 579, 580 (N.C. App. 1977) (holding, under a predecessor to North Carolina's current DWI statute, that guilty knowledge as to the alcoholic nature of the beverage consumed and the level of alcohol in one's bloodstream is not an element of the offense). One could very

---

[4]Brewer's argument from the holding of *Bell v. Burson*, 402 U.S. 535 (1971), which held that deprivation of a voluntarily-granted license can trigger due process protections, is not persuasive because the fact that license revocation triggers due process protections does not mean that such revocation involves an affirmative disability.

well have a blood alcohol level slightly above the legal limit, have a substantial alcohol tolerance, and be unaware that one's blood alcohol level exceeds the limit or even that one is intoxicated as the law defines that term; such lack of scienter is not a defense to a charge of driving while intoxicated. We thus conclude that no finding of scienter is required before the sanction in this case may be imposed, a factor which cuts against a finding that it is a criminal punishment.

### 4.  *Traditional Aims of Punishment*

Brewer argues that the legislative history clearly indicates that the primary goal of the thirty-day ALR period is deterrence, a traditional aim of punishment. Indeed, the *Halper* Court stated that deterrence is not a legitimate nonpunitive government objective, so that a sanction that cannot be said solely to serve purposes other than deterrence constitutes punishment for Double Jeopardy purposes. *Halper*, 490 U.S. at 448. As discussed above, this portion of the *Halper* holding has been repudiated by the Supreme Court. *See Hudson*, 522 U.S. at 105 (stating that "the mere presence of this [deterrence] purpose is insufficient to render a sanction criminal, as deterrence may serve civil as well as criminal goals" (internal quotation marks omitted)). Further, we have recognized that "the argument that suspending a motorist's driving privileges is punitive because some element of deterrence is involved is without merit." *United States v. Imngren*, 98 F.3d 811, 816 (4th Cir. 1996). We conclude that under current jurisprudence, this prong of the *Hudson* analysis is at best neutral; Brewer cannot demonstrate that the thirty-day ALR principally serves traditional goals of punishment.

### 5.  *Applies Only to Criminal Conduct*

This portion of the *Hudson* test clearly favors Brewer, as the thirty-day ALR provision only applies when a driver commits a criminal act of driving while impaired. Alone, however, this factor is insufficient to establish that the thirty-day ALR provision is a criminal penalty. *See Hudson*, 522 U.S. at 105 (stating that the fact that conduct which is subject to a civil sanction is also criminal is not sufficient by itself to render the sanctions criminal); *Imngren*, 98 F.3d at 816 (stating that "[i]t is well settled that Congress may impose both a criminal and a civil sanction in respect to the same act or omission" (internal quota-

tion marks omitted)). The State does not dispute that this factor favors Brewer, but merely argues, correctly, that it is not sufficient by itself to render a sanction criminal.

6.  *Alternative, Non-punitive Purpose and Excessiveness in Relation to Non-punitive Purpose*

Because Brewer treats these last two *Hudson* factors as so closely related as to warrant treatment together in his brief, we will similarly examine them in tandem. Brewer argues that there is no evidence that a thirty-day ALR period serves any legitimate remedial goal more effectively than a ten-day period, and thus, the only possible explanation for the decision of the Legislature to lengthen the period from ten to thirty days is a desire to impermissibly exact multiple criminal punishments. Brief of Appellant at 23-24. The State notes that in *Imngren*, we stated that "[t]he suspension of driving privileges is not primarily an act of punishment; rather, suspension promotes public safety by removing from the highways motorists who have shown a tendency to drive under the influence of alcohol." *Imngren*, 98 F.3d at 816. The State thus argues that its alternative, remedial purpose is simply to remove unsafe drivers from the highways, and a thirty-day ALR period serves this goal more effectively than a ten-day period. The State further argues that N.C. Gen. Stat. § 20-16.5(p)'s provision for the restoration of limited driving privileges after ten days provided that certain conditions — such as a substance abuse evaluation — are met, renders the thirty-day ALR period remedial because the longer period causes drivers to apply for limited driving privileges, which in turn brings them into contact with substance abuse professionals who can help to remediate their tendency to drive under the influence. In terms of whether the thirty-day sanction is excessive in relation to its remedial goal, the district court found that the provision for the restoration of limited driving privileges after ten days negates any claim that the § 20-16.5 is excessive in relation to its nonpunitive goals. We find this reasoning persuasive. Requiring persons charged with DWI to undergo a substance abuse assessment and attend a court hearing prior to restoration of limited driving privileges would seem to be a valid remedial goal; the longer ALR period functions as an incentive to cause persons charged with DWI to address their possible substance abuse problems, and their contact with treatment professionals and court personnel could rationally be viewed as a non-deterrent

means of reducing the likelihood of recidivism. We thus conclude that the thirty-day ALR provision rationally serves legitimate remedial goals and is not excessive in relation to these goals.

## III.

In conclusion, because Brewer cannot show by the "clearest proof" that North Carolina's thirty-day ALR period is so punitive either in purpose or effect as to amount to a criminal punishment, the district court properly granted summary judgment in favor of Kimel. The judgment of the district court is therefore affirmed.

*AFFIRMED*