**PRIME TIME SHUTTLE INTERNATIONAL, INC., Plaintiff,**

v.

**CALIFORNIA PUBLIC UTILITIES COMMISSION, et al., Defendants.**

**No. C–96–3146–CAL.**

United States District Court, N.D. California.

Nov. 10, 1998.

---

**15.** Of course, NMI's contract was not breached, it was simply allowed to expire.

Ellis Ross Anderson, Anderson Donovan & Poole, San Francisco, CA, for plaintiff.

Paul T. Hammerness, Cal. State Atty. General's Office, San Francisco, CA, Alberto Guerrero, Public Utilities Com'n of State of Cal., San Francisco, CA, for defendants.

*ORDER: DEFENDANTS' MOTION FOR SUMMARY JUDGMENT*

LEGGE, District Judge.

## I. PROCEDURE

Plaintiff Prime Time Shuttle International has filed this lawsuit against the California Public Utilities Commission; Commissioners P. Gregory Conlon, Daniel W. Fessler, Jessie L. Knight, Jr., Henry Duque, and Josiah L. Neeper; and individual employees of the Commission, Wesley M. Franklin, William R. Schulte and Larry E. McNeely. Plaintiff alleges that defendants, through selective and retaliatory enforcement of Commission rules and regulations, (1) violated plaintiff's rights to due process and free speech under 42 U.S.C. § 1983 and (2) violated plaintiff's Fifth Amendment right to freedom from double jeopardy. Plaintiff seeks monetary and injunctive relief.

On December 5, 1997 this court dismissed the Commission as a defendant, but denied defendants' motion to dismiss the individual defendants under F.R.C.P. 12(b)(6) on the grounds of qualified immunity.

Defendants then brought this motion for summary judgment, arguing that they are entitled to qualified immunity under F.R.C.P. 56. Plaintiff filed an opposition, but did not provide a factual record regarding each defendants' involvement, as ordered by this court in earlier proceedings, and merely restated the arguments contained in plaintiff's second amended complaint and prior papers. Having reviewed the briefs, the arguments of counsel, the factual record, and the applicable authorities, the court finds that there are no genuine issues of material fact and that

defendants' motion for summary judgment should be GRANTED as a matter of law for the reasons stated below.

## II. FACTS

This suit arises primarily from two investigations of plaintiff by the Commission for allegedly conducting unlawful passenger stage operations at various airports including, but not limited to, Los Angeles International Airport ("LAX"). During the course of those investigations, the Commission concluded that plaintiff was violating the California Labor Code, the California Public Utilities Code § 5401,[1] and the Commission's General Order ("GO") 158–A,[2] by failing to comply with LAX's airport regulations (LAX Rule III.B.15)[3] which prohibited the use of non-employee drivers.

This record is complicated because of the various types of regulated passenger carrier services, and because LAX and the Commission have different regulations regarding the carriers. A *passenger stage corporation* (PSC) is a public utility that may not operate without obtaining a Certificate of Public Convenience and Necessity ("certificate") issued by the Commission. Plaintiff is a PSC. But as market demand shifted, plaintiff began to use non-employee drivers with a charter-party carrier ("TCP") certificate as airport drivers.

Throughout its investigations and proceedings, the Commissioners believed that (1) the Public Utilities Code permitted PSCs to collect individual fares, but not to lease or assign their certificate to a subcarrier without authorization from the Commission; and (2) that PSCs were required, and only PSCs

1. Cal. Pub. Util.Code § 5401 prohibits charter-party carriers from charging individual fares (except school bus contractors), but does not prohibit passenger stage corporations from using non-employee drivers with TCP authority to charge individual fares.

2. Commission Rules, General Order 158–A § 3.03, in relevant part states, "Subcarriers. A carrier shall not use the services of another carrier (subcarrier) that provides the vehicle and the driver, unless the second carrier holds Commission authority as a charter-party carrier." Section 5.03 in relevant part states, "Driver Status. Every driver of a vehicle shall be the permit/cer-

tificate holder or under the complete supervision, direction, and control or the operating carrier and shall be: A. An employee of the certificate holder; or B. An employee of the sub-carrier; or C. An independent owner-operator who holds charter-party carrier authority and is .operating as a subcarrier."

3. LAX Ground and Transportation Permit Program Rule III.B.15 provides, "[e]ach driver must be a bona fide employee of the company for which he or she drives. Each driver must be paid by commission, salary or combination thereof."

were allowed to display a distinctive identifying symbol on their vehicles. The Commissioners also believed that TCP carriers were permitted to operate at airports by statute after obtaining a TCP certificate, but only on a pre-arranged basis, and could not charge individual fares. The Commission's interpretation of these regulations was later rejected by Administrative Law Judge Kotz in his 1996 Proposed Decision (D.96–08–034).

Plaintiff's section 1983 claim rests on the Commission's two investigations. The first investigation, Order Instituting Investigation ("OII") 93–05–004 (1993), resulted in a settlement between plaintiff and the Commission in which plaintiff was put on three-years probation and promised, among other things, to comply with the provisions of GO 158–A, cancel agreements with non-employee drivers and to use only bona fide employees or licensed TCPs in the performance of its passenger stage operations.

Just before OII 93–05–004 was issued, plaintiff filed an application seeking either confirmation that GO 158–A authorized use of licensed subcarriers in the performance of passenger stage operations, or in the alternative, an exemption from GO 158–A. The Commission denied the application, concluding that GO 158–A did not allow for non-employee drivers to meet the day to day operational needs of passenger stage carriers. This was consistent with the Commission's earlier denial of a similar application by SuperShuttle, a competing PSC. In that application, the Commissioners indicated that GO 158–A requires the complete supervision, direction and control by a PSC of any licensed subcarrier it might use. Both plaintiff and SuperShuttle voluntarily dismissed their applications.

In 1994 the Los Angeles City Attorney's Office filed a criminal complaint in Municipal Court against plaintiff, alleging Labor Code and Public Utilities Code violations resulting from plaintiff's use of non-employee drivers at LAX. Plaintiff claims that the Commission orchestrated those criminal proceedings. But that claim was not substantiated by the record, and is also irrelevant to this case. John E. Kindt, Jr., appearing for plaintiff, pled nolo contendere to violations of Public Utilities Code § 2110 and III.B.15 of the LAX Rules and Regulations. The Municipal Court fined plaintiff $500 and placed plaintiff on two-years probation, which was later extended until June 6, 1997 because of probation violations in March 1995 to which Kindt pled guilty and paid an extra fine.

After the Municipal Court decision, plaintiff did not change its operations. Shortly after the decision, Commission investigators and the California Highway Patrol conducted unannounced compliance inspections. These revealed that plaintiff was using at least 31 non-employee drivers (at least 12 of whom did not possess valid TCP certificates) and was using non-employee drivers at LAX in violation of LAX Rule III.B.15. The Commission investigation found that the non-employee drivers paid a fee to plaintiff to operate a shuttle van using plaintiff's name and logo, and were entitled by their agreements to collect and retain individual fares. The Commission concluded that this practice violated Public Utilities Code § 5401, prohibiting TCPs from retaining individual fares, as well as regulations prohibiting PSCs from leasing their certificate of authority without permission. The Commission also concluded that this behavior violated GO 158–A, LAX Rules and the terms of the 1993 settlement, wherein plaintiff agreed to abide by all Commission and LAX rules and regulations.

Recognizing that the Municipal Court decision had not changed plaintiff's unlawful operations, the Commission commenced a second investigation (OII 95–07–001) in 1995. The 1995 investigation led to ALJ Kotz' Proposed Decision, adopted by the Commissioners (D.96–08–034). The decision imposed a $100,000 fine on plaintiff, probation, and revoked plaintiff's certificate unless plaintiff submitted a suitable plan for bringing its operations into compliance.

ALJ Kotz found that the Commission was mistaken in its belief that the plaintiff violated Public Utilities Code § 5401 and GO 158–A by using non-employee drivers. Specifically, the ALJ held that plaintiff and other PSCs were allowed to use non-employee drivers with TCP authority. He held that these non-employee drivers may drive vehicles with plaintiff's logo and may collect indi-

vidual fares under Public Utilities Code § 5401, as long as they charge only plaintiff's stated fare rates.

However, plaintiff was held to be in violation of LAX Rule III.B.15 against non-employee drivers. This conclusion has never been challenged by plaintiff and it is the same violation that plaintiff pled guilty to in Municipal Court. Additionally, ALJ Kotz found that "Prime Time's persistent operation in violation of Rule III.B.15 violates both GO 158–A and the settlement of the 1993 OII."

## III. THE COMPLAINT

Plaintiff has asserted two claims for relief. Its section 1983 claim asserts that defendants "either personally engaged in, or … supervised, sanctioned and ratified the pursuit of harassing, improper, illegal, selective, retaliatory and retributive enforcement tactics against plaintiff," in violation of plaintiff's due process and free speech rights. It further alleges that defendants attempted to conceal their wrongful conduct and influenced ALJ Kotz' decision through ex parte contacts. Plaintiff seeks damages, fees and costs.

Plaintiff's second claim asserts a violation of its Fifth Amendment rights to freedom from double jeopardy. Plaintiff argues that the Commission's investigations, license revocation and fine are punishment for the same acts that led to plaintiff's conviction in Municipal Court. It asks for declaratory and injunctive relief to prevent defendants from enforcing the $100,000 fine.

Defendants move for summary judgment on both of plaintiff's claims.

Summary judgment is proper where the pleadings, discovery and affidavits show that there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Material facts are those which may affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a

reasonable jury to return a verdict for the nonmoving party. *Id.*

The moving party in a motion for summary judgment bears the initial burden of identifying those portions of the pleadings, discovery and affidavits which demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party meets its initial burden, the nonmoving party must go beyond the pleadings and, by its own affidavits or discovery, "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *see British Airways Bd. v. Boeing Co.,* 585 F.2d 946, 950–52 (9th Cir.1978). If the nonmoving party fails to make this showing, "the moving party is entitled to judgment as a matter of law." *Celotex,* at 323, 106 S.Ct. 2548. Plaintiff was afforded the opportunity to present a factual record in opposition to defendants' motion, but did not do so.

## IV. THE DUE PROCESS CLAIMS

There is no evidence that the defendants intentionally or knowingly violated the law. Rather, the Commission's conduct towards plaintiff was based on probable cause and was thus objectively reasonable, for the following reasons.

Government officials performing discretionary functions are generally shielded from liability for civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). This rule of qualified immunity provides protection "to all but the plainly incompetent or those who knowingly violate the law." *Burns v. Reed,* 500 U.S. 478, 494–495, 111 S.Ct. 1934, 114 L.Ed.2d 547 (1991), *quoting Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986). "Therefore, regardless of whether the constitutional violation occurred, the [official] should prevail if the right asserted by the plaintiff was not 'clearly established' or the [official] could have reasonably believed that his particular conduct was lawful." *Romero v. Kitsap County,* 931 F.2d 624, 627 (9th Cir.1991).

Whether a reasonable official could have believed the action taken was lawful is a mixed question of law and fact. It involves an objective test of what the official knew and the actions he took. *See Sinaloa Lake Owners Ass'n v. City of Simi Valley,* 70 F.3d 1095, 1099 (9th Cir.1995).

The Commissioners and the Commission's employees are entitled to raise such a qualified immunity defense by a motion for summary judgment. Defendants did so and presented an adequate factual record to shift the burden to plaintiff.

In order to defeat defendants' motion for summary judgment, plaintiff need not adduce clear and convincing evidence of improper motive. *See Crawford–El v. Britton,* 523 U.S. 574, ——, 118 S.Ct. 1584, 1593, 140 L.Ed.2d 759 (1998). But plaintiff must identify affirmative evidence from which a reasonable jury could find that plaintiff has carried its burden of proving the pertinent motive. *See id.* Plaintiff has not sustained this burden.

█ Under its section 1983 claim, plaintiff alleges retaliatory prosecution. Plaintiff must establish that the prosecution was based on an impermissible motive, or that others similarly situated have not been prosecuted. *See Seven Star, Inc. v. United States,* 933 F.2d 791, 793 (9th Cir.1991). However, the record establishes that Commission officials had probable cause to investigate plaintiff and that plaintiff was not the sole target of their enforcement efforts. They were seeking to enforce the laws under their jurisdiction regarding passenger stage operations. They had good reason to do so and their conduct was objectively reasonable. There is no evidence to suggest an impermissible motive.

The record indicates that several companies, including plaintiff, were violating LAX Rule III.B.15. Little was done about it for some time. However, this does not equate with later enforcement being illegal or retaliatory. Greater enforcement efforts began in 1992, following a request for enforcement assistance by LAX airport staff. At that time the Commission formed a task force which resulted in several compliance audits of the carriers and produced five administrative citations and eight orders instituting investigations of plaintiff and other carriers.

Plaintiff's main contention seems to be that the Commission itself did not know what was allowed and what was not allowed under GO 158–A. However, the Commission's denial of applications for exemption, as well as the 1993 settlement agreement, provided two instances in which the Commission's understanding of the rules was made clear to plaintiff. Further, the Municipal Court proceedings made it clear that LAX Rule III. B.15 prohibited non-employee drivers. Despite these indicators, plaintiff continued to use non-employee drivers and to sell or lease its PSC authority without authorization.

Even if the distinction between LAX and Commission rules was unclear and even if the earlier enforcement efforts were dilatory, defendants did not knowingly violate the law by investigating and punishing plaintiff. The Commission reasonably thought that plaintiff's behavior was illegal under its regulations and it investigated plaintiff on that objectively reasonable belief. Complaints from customers and competitors to the Commission staff caused the first investigation of plaintiff. Plaintiff received multiple warnings that the Commission believed that plaintiff's use of unauthorized non-employee drivers violated GO 158–A. In 1993 plaintiff entered the settlement, agreeing to abide by Commission's and LAX's rules, the latter of which specifically and unquestionably prohibited non-employee drivers. The second investigation was authorized following an airport inspection which found that plaintiff was still using unlicensed non-employee drivers and was selling or leasing its PSC authority without authorization. These activities directly contravened the settlement agreement signed a year earlier.

Further, ALJ Kotz concluded that plaintiff gave the Commission "cause for both distrust and skepticism," and that there is "no evidence of the gross improprieties with which S & E [the enforcement branch of the Commission] has been charged by Prime Time." Even though the ALJ's decision determined that the Commission was wrong in some of its regulatory interpretations, the ALJ still

found that Commission's policies and procedures were appropriate; that plaintiff held most of the blame; that plaintiff had violated LAX regulations; that the settlement agreement had been breached; and that plaintiff's accusations of improprieties were unfounded.

Plaintiff alleges improper ex parte communications between the ALJ and the Commission. But plaintiff fails to put forth any evidence beyond the allegation in the second amended complaint. There plaintiff alleges that ALJ Kotz met with Commissioner Duque on July 29, 1996, one day before the ALJ issued his revised Proposed Decision. However, no evidence is presented to support the allegation, and ALJ Kotz denied it in his declaration. Plaintiff further argues that ALJ Kotz succumbed to the Commission's improper pressure when he revised his decision pertaining to the amount of the fine. However, that exchange and decision took place on the record, during an open, public meeting. The presence of the ALJ at the meeting of the Commission was an ordinary part of Public Utilities Commission procedure. As such, it was not an improper ex parte communication.

Plaintiff has not proffered any affirmative evidence from which a jury could find the requisite impermissible motivation. Further, the record of probable cause demonstrates that defendants' conduct was objectively reasonable. Defendants' motion for summary judgment on the Section 1983 claim is therefore GRANTED.

■ "Qualified immunity is an affirmative defense to damage liability; it does not bar actions for declaratory or injunctive relief." *American Fire, Theft & Collision Managers, Inc. v. Gillespie*, 932 F.2d 816, 818 (9th Cir. 1991). Therefore, defendants cannot claim qualified immunity as an affirmative defense to plaintiff's double jeopardy claim, which seeks declaratory and injunctive relief.

## V. THE DOUBLE JEOPARDY CLAIMS

■ The Commission's $100,000 fine did not subject plaintiff to double jeopardy. In summary, it was based on new evidence and new violations that continued after the Municipal Court's order. Further, the Commission's fine was civil and not criminal.

The Double Jeopardy Clause provides that no person shall "be subject for the same offense to be twice put in jeopardy of life or limb." U.S. Const. amend. V. Plaintiff argues that the Commission investigation, license revocation and $100,000 fine is punishment for the same acts that led to plaintiff's conviction in the Municipal Court. However, double jeopardy is not applicable, because the violations and dates implicated in OII 95–07–001 are different from those charges to which plaintiff pled nolo contendere in the Municipal Court. The Municipal Court proceeding and the 1996 penalties by the Commission stem from similar facts and violations. But there are important time differences. The sanctions imposed by the Commission were based on new evidence gathered during investigation OII 95–07–001, ordered on July 6, 1995, more than a year after plaintiff pled nolo contendere in Municipal Court, and several months after the Municipal Court issued its final order extending the probationary period an additional year.

The Commission held in (D.96–08–034) that during a period of approximately 15 months between the time of the Municipal Court's last order, May 11, 1995, and the issuance of the Commission's (D.96–08–034), August 8, 1996, plaintiff engaged in further violations of LAX Rule III.B.15. Consistent with Public Utilities Code § 2108,[4] ALJ Kotz determined that, "[p]laintiff continues to violate LAX Rule III.B.15 and the 1993 settlement agreement every day ... these new offenses are not the 'same offense' for which plaintiff paid a fine in Municipal Court." In the case of a continuing violation, each day's violation is a separate offense.

In conjunction with (D.96–08–034) (1996), the Commission also charged that plaintiff was in violation of its 1993 settlement agree-

---

4. Cal. Pub. Util.Code § 2108 states: "[e]very violation of the provisions of this part or of any part of any order, decision, decree, rule, direction, demand, or requirement of the Commission, by any corporation or person is a separate and distinct offense, and in the case of a continuing violation, each day's continuance, thereof shall be a separate and distinct offense."

ment in which plaintiff agreed to comply with all Public Utility Codes and specifically, GO 158–A.

Even if the Commission's charges were viewed as part of the same transaction, under the same elements test, double jeopardy does not apply. "Where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." *Blockburger v. United States,* 284 U.S. 299, 304, 52 S.Ct. 180, 76 L.Ed. 306 (1932).

In *United States v. Wolfswinkel,* 44 F.3d 782, 784 (9th Cir.1995), the Ninth Circuit applied the *Blockburger* test and determined that where the misapplication of bank funds statute only required an isolated act of misapplication, but the bank fraud statute required proof of a "scheme or artifice to defraud," each statute required proof of separate elements, and thus, were separate offenses. *Id.* After an analysis of the elements of each offense, courts also look to other indications of legislative intent to determine if the two statutes were designed to punish two distinct evils or merely one. *See United States v. Hairston,* 64 F.3d 491, 496 (9th Cir.1995), *quoting, Wolfswinkel,* 44 F.3d at 785.

In this case, the Municipal Court charges were for violations of Public Utilities Code § 2110 and LAX Rule III.B.15, prohibiting PSC's from using non-employee drivers at LAX airport. The Commission's charges involved a violation of GO 158–A, resulting from the consistent and continual violation of LAX Rule III.B.15. While LAX's Rule III.B.15 involves only an isolated act by the carrier, section 3.01 of GO 158–A requires

proof of consistent failure to comply with airport rules.[5] Different elements are required under each regulation.

The court also notes that the enforcement here is by two separate authorities, the County of Los Angeles and the state Public Utilities Commission. An examination of the legislative intent behind each of their regulations reveals that LAX Rule III.B.15 is primarily a traffic and safety regulation. But GO 158–A is designed to ensure that PSCs operate in accordance with the requirements of their licensing certificate. Thus, the elements, legislative purposes, and enforcing authorities all differ.

■ The double jeopardy clause protects only against the imposition of multiple *criminal* punishments for the same offense. *See Hudson v. United States,* 522 U.S. 93, 118 S.Ct. 488, 493, 139 L.Ed.2d 450 (1997). Plaintiff argues under *United States v. Halper,* 490 U.S. 435, 109 S.Ct. 1892, 104 L.Ed.2d 487 (1989), that the discrepancy between the $500 Municipal Court criminal fine and the $100,000 Commission civil fine is so egregious that it alone transformed Commission's disciplinary action into a criminal sanction.

■ However, that rational was explicitly rejected in *Hudson,* where the Supreme Court held that the determination of whether a sanction is a criminal one depends upon numerous factors[6] viewed in relation to the statute itself and not the fine alone. *See Hudson* 118 S.Ct. at 493. Only "the clearest proof will suffice to override legislative intent and transform what has been denominated a civil remedy into a criminal penalty." *Id., quoting, United States v. Ward,* 448 U.S. 242, 248–249, 100 S.Ct. 2636, 65 L.Ed.2d 742

**5.** GO 158–A, § 3.01 reads, "Operations at Airports: No carrier shall conduct any operations on the property of or into any airport unless such operations are authorized by both this Commission and the airport authority involved. Consistent failure to comply with safety or traffic rules and regulations of an airport authority may result in suspension or revocation of Commission operating authority."

**6.** Factors providing useful guidepost include: "(1) whether the sanction involves affirmative disability or restraint; (2) whether it has histori-

cally been regarded as punishment; (3) whether it comes into play on finding of scienter; (4) whether its operation will promote traditional aims of punishment, namely retribution and deterrence; (5) whether behavior to which it applies is already a crime; (6) whether alternative purpose to which it may rationally be connected is assignable for it; and (7) whether it appears in relation to alternative purpose assigned." *Hudson,* 118 S.Ct. at 493, *quoting Kennedy v. Mendoza–Martinez,* 372 U.S. 144, 168–169, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963).

(1980). In *Hudson,* the Court held that the double jeopardy clause was not a bar to a criminal prosecution for misapplication of bank funds, even though that criminal prosecution followed an administrative agency's imposition of a fine and occupational debarment because the administrative proceedings were civil and not criminal. *Id.* In rejecting the *Halper* standard relied upon by plaintiff here, the *Hudson* Court stated that although "all civil penalties have some deterrent effect ... neither money penalties nor debarment have historically been viewed as punishment....We have long recognized that revocation of a privilege voluntarily granted, such as debarment, is characteristically free of the punitive criminal element." *Id.* at 495–496. Likewise, in this case, the Commission is a regulatory agency whose disciplinary action here concerns licensing issues and plaintiff's fitness as a PSC.

Even under the now rejected *Halper* standard, a civil sanction imposed after a criminal proceeding is permissible as long as it is remedial and not retributive. *See Halper,* 490 U.S. at 448, 109 S.Ct. 1892. Here, the ALJ imposed the $100,000 fine to "prevent further offenses and give the offender a fair and reasonable opportunity to rehabilitate itself....The severity of the sanctions is necessary in light of Prime Time's continued flouting of the terms of the Municipal Court's probation order." The $100,000 fine is actually less than 50% of the $225,000 fine that the Commission could have imposed on plaintiff were it to have attributed $500 for each day's violation, over a period of approximately 15 months. Other than the disparity with the Municipal Court fine, plaintiff provides no evidence to suggest that the $100,000 fine is disproportionate considering plaintiff's sophistication, compliance record, and the nature of its violations.

There are no triable issues of material fact regarding the double jeopardy claim and defendants' motion for summary judgment must be GRANTED.

IT IS SO ORDERED.