**Joseph S. JAICERIS, Petitioner,**

v.

**J.W. FAIRMAN, Warden, Respondent.**

**No. C 99–0522 WHA (PR).**

United States District Court,
N.D. California.

Nov. 5, 2003.

Joseph S. Jaiceris, Corcoran, CA, pro se.

Thomas A. Brady, CA State Attorney General's Office, San Francisco, CA, for respondent.

## DENIAL OF PETITION FOR WRIT OF HABEAS CORPUS

ALSUP, District Judge.

This is a habeas corpus case filed by a state prisoner pursuant to 28 U.S.C. § 2254. The court ordered respondent to show cause why the writ should not be granted. Respondent's motion to dismiss on grounds it was not possible to determine petitioner's claims was granted and the petition was dismissed with leave to amend. After amendment, the court issued another order to show cause. Respondent has filed an answer and a memorandum of points and authorities in support of it, and has lodged exhibits with the court. Petitioner has responded with a traverse. The matter is submitted.

### STATEMENT

Petitioner was convicted by a jury on multiple counts of sex crimes. He was sentenced to prison for fifty-five years. As grounds for habeas relief he asserts that: (1) his due process rights were violated by admission of evidence of other crimes; (2) evidence was erroneously admitted; (3) the trial judge should have given a jury instruction, CALJIC. 2.23, sua sponte; (4) his counsel was ineffective; and (5) he was seen in shackles by the jurors.

The following facts are taken from the opinion of the California Court of Appeal:

Lisa Lawrence first met defendant in 1992 when he began dating her mother, Delila LeFave. Lawrence and her boyfriend Glen Rasmussen socialized and "partied" with her mother and defendant, who eventually moved in with LeFave. Lawrence and Rasmussen began using heroin, and used heroin once with defendant.[1] Lawrence never got along with defendant, although she treated him decently because he was her mother's boyfriend. Defendant was friendly with Rasmussen and did certain favors for Lawrence, but she believed he mistreated her mother and advised her to leave him. In 1994 Lawrence went through drug rehabilitation, separated from Rasmussen and then lived with her mother for a few moths before moving to New York.

On Saturday, November 26, 1994, Lawrence returned from New York with her current boyfriend Don Foote to pick up her possessions from storage and to visit her mother. At her mother's apartment in Sunnyvale, Lawrence, Foote, LeFave and defendant drank beer and smoked marijuana. Around 6 p.m., the group went to a bar, with Lawrence driving her mother's car. An hour and a half later, LeFave asked Lawrence to drive defendant to his friend's house. Lawrence didn't want to do so, but eventually did. At a house in Mountain View, defendant came back to the car with a man named Ed and told Lawrence to drive to East Palo Alto to get drugs. She was reluctant, but felt she couldn't refuse. After obtaining some white rocks in East Palo Alto, they drove back to Ed's house, where he and defendant argued because defendant refused to give Ed any of the drugs even though he had procured them. Law-

rence voiced support for Ed, but defendant refused.

Defendant then told Lawrence to take him to her mother's apartment. She had to let him in with her mother's keys, so she went inside to call the bar. This was about 9 p.m. Defendant began smoking the crack cocaine and Lawrence took a puff. She sat down to retie her boot before she left. Defendant then started walking towards her; she knew he was going to try to kiss her and she was frightened. She told him, "Let's not do this." He held her face and kissed her. He then tried to slip off her blouse. She pleaded with him not to proceed because everyone would know. As he continued, she fought. He then started hitting her. She took off her blouse to buy time and tried to run to the front door. Defendant tackled her; she feel to the floor, hitting her head on the door knob. Defendant hit her head and shoulders with his fist, and then hit her lower body when she put her arms over her face. He pulled at her clothes, but she said she would take them off, so he would stop hitting her. He then put his hands around her throat and choked her until she passed out.

When she woke up, defendant was pushing his fingers into her vagina in a painful manner. She struggled and attempted to crawl to the kitchen, He then took his penis out and told her to "suck my dick." She was crying and complaining that her mouth was dry and bloody. He got her a coke from the refrigerator and told her the drink it. He said he wanted her to "suck his dick" to compare it to her mother. He put his penis back in her mouth. She struggled and ran to the front door again. He again tackled her, hit and choked her. This time was worse; she couldn't

---

1. Lawrence also admitted smoking crack co-caine with defendant once.

breathe. She feared for her life as he threatened to kill her. After passed out a second time, she awoke with all her cloths off. She was exhausted and in pain, and could no longer fight back. She cried and pleaded with him. At some point, he put the cocaine pipe to her lips a second time and ordered her to smoke it.

Defendant then pulled her up and shoved his finger in her rectum. He carried her, screaming, into the bedroom and put his tongue in her vagina. She no longer resisted. Soon the telephone started ringing. Defendant stood beside the bed rubbing his penis and then urinated on the rug and nightstand. Lawrence told defendant that the telephone call was probably her mother and boyfriend looking for her and that they should clean up so she could get back. She wanted him to think she was not going to tell anyone what had happened, so she suggested going to the nearby 7–11 to get beer. She got dressed, washed her bloody face and neck; together they cleaned up the apartment. Defendant started to drive LeFave's car to the store, but Lawrence insisted she needed to walk to get herself together. When they got to the store, she waited until he entered and then she ran down the road, trying to flag down a car.

Private security guards in a car saw a hysterical woman flinging her arms in the air and trying to hail cars. They stopped to investigate and called the police. The woman (Lawrence) was frightened, hysterical, shaking and crying. She had a swollen face and bleeding lip.

At the hospital, Lawrence told the investigating police officer what had happened but only in part, in that she reported two acts of sexual assault, defendant's penetration of her vagina with his fingers and the forced oral copulation of his penis.[2] She told the officer that she had lost consciousness at least twice as defendant choked her. The officer noticed definite choke marks on her neck. Lawrence said she tried to escape, but could not get the door open, and eventually stopped fighting back because she was hurt. She did not tell the officer about going to buy drugs or using drugs because she did not want to get into trouble.[3]

Lawrence was then examined by a Sexual Assault Response Team nurse who was an expert in the examination of sexual assault victims. The examination showed numerous red marks and bruises on Lawrence's neck that appeared to have been made by fingers, dried blood on her lip, swelling in her cheek, redness around her eye, many abrasions and bruises on various parts of her body, including deep abrasions on her elbows that were like rug burns. There were similar abrasions on her back and hematomas on her head. Lawrence had redness in the genital area and a deep bruise on the cervix, possibly caused by fingers. Also present were rectal abrasions and semen stains on her right thigh. The nurse opined that the injuries were consistent with the history of the crime that had been reported.

Investigation of the crime scene showed spilled flower pots, blood under a rug, on the coffee table and on the kitchen floor. Blood was found on Lawrence's clothes and underpants, as well as on defendant's clothes.

Defendant testified at trial and essentially described the events as rough but

---

**2.** Apparently at the preliminary hearing, she gave the same testimony as at trial about other acts of sexual assault.

**3.** In a police interview two days later, she admitted using cocaine.

consensual sex. He explained that he and Lawrence (and sometimes her boyfriend) used drugs together occasionally (heroin and cocaine) while he lived with Lawrence's mother. he also said she had orally copulated him once as payback for a drug purchase. Defendant said that on the night in question, he, Lawrence's mother, Lawrence and her boyfriend drank beer and smoked marijuana before going to a bar. He said Lawrence was pretty friendly with him and told him not to drink too much. He interpreted this as meaning that she wanted to have sex with him. When she was driving him home from the bar, she indicated she wanted to get some cocaine. He then described essentially the same events Lawrence did in obtaining the drugs, although he said his friend was named Larry.

According to defendant, back at the apartment, Lawrence began smoking the cocaine pipe and would not give it back to him. As she continued to smoke, he began kissing and fondling her. She then took too big a drag, pulled away from him and ripped her shirt. He was concerned that she was overdosing and tried to get the pipe away from her. As they struggled over the pipe, he accidently hit her in the eye. They then sat on the couch and had a friendly conversation, but Lawrence began to get worried about the time. Defendant told her they should have sex and it could be quick. She agreed. She then took off her clothes and he orally copulated her. After he made an insulting comment, she "shoved her asshole right on [his] mouth."

Lawrence got up and went into the kitchen. He apologized and said he thought she was going to "ball" him. As she started to undo his belt and pants, he suggested they go into the bedroom. He urinated on the nightstand and floor; she seemed upset and disgusted and went into the bathroom. After she said she was going back to the bar, they struggled over the car keys, and both fell. She hit her head on the door knob; he cut his hand on a planter. When he tried to grab the keys, she poked his eye. They began to fight and he squeezed her neck, but she did not pass out. In fact, according to defendant, as she examined his eye, they began kissing again. He offered her more cocaine to smoke after he grabbed the keys from her.

As she lay on the floor, he began to rub her vagina. They ignored the ringing telephone, they kissed and he continued to "finger" her, but not roughly. Defendant said he then reminded her that she was going to "ball" him. She began to touch his penis, but then moved her body "on purpose" so that his finger went into her rectum. He claimed to be upset and no longer interested in sex. He also testified that he thought she was going to call the police after this incident.

Lawrence said she was ready to go, so they cleaned up the mess. He had the car keys and started to drive to the 7–11. She was upset because he would not let her drive, so she walked. When he went inside to buy cigarettes and beer, she disappeared. Defendant said he went back to the apartment, and thought to himself that Lawrence would probably call the cops on him. Soon thereafter, he was arrested. He admitted some of her injuries, but insisted they were accidental.

Two friends of defendant each testified that they had seen Lawrence with defendant on one or two prior occasions and described her behavior as physically playful, hanging on him, grabbing his buttocks, fondling and kissing him. One was his friend "Ed" who denied supply-

ing drugs or seeing defendant and Lawrence on the night in question.

Other testimony at trial included the victim of a prior sexual assault by defendant. Ruth Curtner testified that in 1983 she lived with a male roommate, Randy. On July 10, Randy came home accompanied by a couple he had met in a bar, defendant and defendant's girlfriend. The men were loud, out of control and appeared to be under the influence of something. Curtner asked Randy to get defendant out of the apartment. Defendant had been aggressive and made rude remarks with sexual connotations to Curtner. The next afternoon, Curtner came home sick from work and found Randy and defendant in the apartment. She told Randy to get defendant out "now." The two left. Curtner took off her jeans and went to bed.

About two hours later, Curtner heard knocking at the front door and defendant's voice saying, " 'Let me in.' " She did not answer. Soon thereafter she heard noise on her second floor balcony and the sliding glass door opened. Defendant entered. He was erratic, nervous, excited and pacing. She told him Randy was not there and in response to his question of where Randy's "stuff" was, she said she did not know what he meant. He asked for Randy's "apparatus" or "syringe" or "outfit." Curtner still did not understand because she did not know anything about Randy's drug use. Although she asked defendant to leave, he began looking around the apartment.

Defendant then became angry with Curtner. He walked over to the bed and slugged her in the side with his fist. He continued to hit her and called her obscene names. He asked her questions, but slapped her before she could answer. The he asked, "Have you ever been raped?" She said, "No." He slapped her and said, " 'I'm going to rape you and then I'm going to kill you.' " He then grabbed her hair, unzipped his pants, pulled out his penis and said in a threatening manner, " 'suck this.' ' As he was forcing her to orally copulate him, Randy came in the front door. Defendant quickly zipped up his pants and walked out of the room. Curtner was hysterical and screamed at Randy to get defendant out of the apartment. He did so. Curtner had bruises on her head, arms and legs and severe pain in her jaw.

Defendant explained that he pleaded guilty to a violation of Penal Code section 220 [assault with intent to commit oral copulation], but maintained he was actually not guilty of the offense. He said he was attempting to rip-off drugs and knew Randy kept needles in the apartment. He also said Curtner hit him first. He pleaded guilty on his lawyer's advice.

Ex. F at 1–10 [footnotes in original].

## DISCUSSION

### A. *Standard of review*

The petition in this case was filed after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), so the provisions of that act apply to it. *See Lindh v. Murphy,* 521 U.S. 320, 327, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997); *Jeffries v. Wood,* 114 F.3d 1484, 1499–1500 (9th Cir.), *cert. denied,* 522 U.S. 93, 118 S.Ct. 488, 139 L.Ed.2d 450 (1997) ("justice and judicial economy are better served by applying the Act to cases filed after the enactment date."). Under the AEDPA a district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was

contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

A state court decision is "contrary to" Supreme Court authority, that is, falls under the first clause of § 2254(d), only if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 1518, 1523, 146 L.Ed.2d 389 (2000). A state court decision is an "unreasonable application of" Supreme Court authority, falls under the second clause of § 2254(d), if it correctly identifies the governing legal principle from the Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's case." *Id.* The federal court on habeas review may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 1522, 120 S.Ct. 1495. Rather, the application must be "objectively unreasonable" to support granting the writ. *See id.* at 1521–22, 120 S.Ct. 1495.

As to questions of fact, under 28 U.S.C. § 2254(d)(2), a federal habeas court may grant the writ if it concludes that the state court's adjudication of the claim resulted in a decision that "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." ' *Torres v. Prunty*, 223 F.3d 1103, 1107 (9th Cir.2000) (quoting 28 U.S.C. § 2254(d)(2) and *Williams*, 529 U.S. at 412–13, 120 S.Ct. 1495).

A district court must presume correct any determination of a factual issue made by a state court unless the petitioner rebuts the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). This presumption is not altered by the fact that the finding was made by a state court of appeals, rather than by a state trial court. *Sumner v. Mata*, 449 U.S. 539, 546–47, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981); *Bragg v. Galaza*, 242 F.3d 1082, 1087 (9th Cir.), *amended*, 253 F.3d 1150 (9th Cir.2001). A petitioner must present clear and convincing evidence to overcome § 2254(e)(1)'s presumption of correctness; conclusory assertions will not do. *Id.*

B. *Issues Presented*

1. *Admission of evidence of prior offense*

Petitioner asserts that admission of evidence of his previous sexual assault of Curtner violated his due process rights. Respondent contends that this claim is barred by a procedural default, in that petitioner did not raise a constitutional ground when objecting to the evidence, and that in any event petitioner's rights were not violated.

a. *Procedural default*

■ It is undisputed that counsel's objection to the Curtner testimony was not based on the federal constitution. The state appellate court grounded its rejection of the federal claim, in part, on this failure to raise it in trial court. Ex. F at 15.

The Ninth Circuit has recognized and applied the California contemporaneous objection rule in affirming denial of a federal petition on grounds of procedural default where there was a complete failure to object at trial. *Vansickel v. White*, 166 F.3d 953, 957–58 (9th Cir.1999). If, however, an objection is actually made but the

trial court in its discretion declines to rule on the merits, for instance because the objection was not timely, the contemporaneous objection rule is deemed not to be a clear, consistently applied and well-established rule of state law that precludes federal review of the claim. *Melendez v. Pliler,* 288 F.3d 1120, 1126 (9th Cir.2002).

Here, counsel objected, but not on the basis that admission of the testimony violated the federal constitution. This circumstance is closer to that in *Vansickel* than that in *Melendez,* in the sense that for purposes of preserving the present claim there might as well have been no objection at all. The Court therefore concludes that this claim was procedurally defaulted. As petitioner makes no effort to show cause and prejudice, it is barred.

b. *Merits*

Alternatively, the Court will consider the merits of the claim.

■ The admission of evidence is not subject to federal habeas review unless a specific constitutional guarantee is violated or the error is of such magnitude that the result is a denial of the fundamentally fair trial guaranteed by due process. *Henry v. Kernan,* 197 F.3d 1021, 1031 (9th Cir. 1999). Failure to comply with state rules of evidence is neither a necessary nor a sufficient basis for granting federal habeas relief on due process grounds. *Id.; Jammal v. Van de Kamp,* 926 F.2d 918, 919 (9th Cir.1991). While adherence to state evidentiary rules suggests that the trial was conducted in a procedurally fair manner, it is certainly possible to have a fair trial even when state standards are violated; conversely, state procedural and evidentiary rules may countenance processes that do not comport with fundamental fairness. *Id.* (citing *Perry v. Rushen,* 713 F.2d 1447, 1453 (9th Cir.1983)). The due process inquiry in federal habeas review is whether the admission of evidence was arbitrary or so prejudicial that it rendered the trial fundamentally unfair. *Walters v. Maass,* 45 F.3d 1355, 1357 (9th Cir.1995); *Colley,* 784 F.2d at 990. But only if there are no permissible inferences that the jury could draw from the evidence can its admission violate due process. *Jammal,* 926 F.2d at 920.

■ Petitioner's defense was that the sexual conduct was rough but consensual. The evidence of petitioner's prior sexual assault was admitted to show his intent to sexually assault the current victim without her consent. The trial court gave a limiting instruction regarding use of the prior crime evidence, telling the jury that it was admitted only to show intent or common plan or scheme, and could not be considered to show that petitioner was a person of bad character or disposed to commit crimes.

First, and conclusively, the United States Supreme Court has specifically left open the question of whether admission of propensity evidence violates due process. *Estelle v. McGuire,* 502 U.S. 62, 75 n. 5, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991). There thus is no "clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d), which could have been violated by admission of the prior crime evidence, and it is impossible for petitioner to show that the state appellate court's rejection of his constitutional claim regarding admission of the evidence "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." *Id.* Habeas relief therefore cannot be granted. *See id.*

■ Secondly, the evidence did tend to show intent, in the sense of absence of accident or inadvertence. There thus was a permissible inferences that the jury could draw from the evidence, so its admis-

sion did not violate due process.[4] *See Jammal,* 926 F.2d at 920.

For these reasons, this claim is without merit.

### 2. *Court of appeals ruling*

 After determining that admission of evidence of the prior sexual assault did not violate state evidentiary rules, the state appellate court considered petitioner's claim that it violated his "constitutional right to due process." Ex. F at 15. The court noted petitioner's procedural default in failing to object on constitutional grounds at trial, then said:

> Moreover, we have concluded above that there was no statutory violation. Any related constitutional claims must also fail. (*People v. Hawkins* (1995) 10 Cal.4th 920, 952, 42 Cal.Rptr.2d 636, 897 P.2d 574.) In this case, we see no separate, discrete violation of due process rights when the challenged evidence was statutorily admissible.

*Id.* at 15–26.

Petitioner appears to contend that this statement was a violation of his due process rights, which was what he contended in his petition for review to the California Supreme Court. *See* ex. G at 3–4. But the court of appeal statement need not be read as a flat statement that compliance with state law necessarily means there was no violation of the federal constitution. The section quoted above might merely indicate that the standards for admissibility under the statute are such that it is impossible for a statutorily-admissible evidence to violate the Constitution. Also, the second sentence quoted above, regarding a "separate, discrete violation of due

process," particularly coupled with the reference to "[i]n this case," shows that the court was not stating a flat rule but rather considering the specifics of this particular case.

Furthermore, even if the court of appeal's statement means what petitioner thinks it does, there is no United States Supreme Court authority that a state court violates due process by holding that compliance with state law means there can be no constitutional violation. Such a state court holding would, of course, be wrong, but would not in itself violate the Constitution. The remedy in such a case would be for another court, either a higher state court or a federal court, to require that the Constitution be given its proper primacy. But in this case this Court has determined that petitioner's rights were not violated by admission of the evidence of the prior sexual assault; therefore, there is no basis for granting the writ here.

The state appellate courts' rejection of this claim was not contrary to, or an unreasonable application of, clearly established United State Supreme Court authority.

### 3. *Instruction*

Petitioner had been convicted pursuant to a plea of guilty on charges arising from the prior sexual assault discussed above. He testified at trial, and the fact that he had been convicted was used to impeach him. Petitioner did not request that the trial court give the standard California instruction that the jury was to consider the conviction only as it went to his credibility, and the trial court did not give the

---

4. The trial court's use of a limiting instruction also prevented any potential unfairness. *See Houston v. Roe,* 177 F.3d 901, 910 n. 6 (9th Cir.1999) (admission of similar prior bad acts to show motive and intent, coupled with limiting instructions, was appropriate); *Terrovona*

*v. Kincheloe,* 912 F.2d 1176, 1180–81 (9th Cir.1990) (admission of prior bad act testimony did not violate due process where trial court balanced probative weight against prejudicial effect and gave jury cautionary instruction).

instruction sua sponte. The court of appeal held that under California law the court was not required to give the instruction in the absence of a request, and that the failure to give it was harmless. Ex. F at 16–17. Petitioner contends that failure to give the instruction violated his Eighth and Fourteenth Amendment rights.

### a. Merits

A state trial court's refusal to give an instruction does not alone raise a ground cognizable in a federal habeas corpus proceedings. *Dunckhurst v. Deeds,* 859 F.2d 110, 114 (9th Cir.1988). The error must so infect the trial that the defendant was deprived of the fair trial guaranteed by the Fourteenth Amendment. *Id.* Omission of an instruction is less likely to be prejudicial than a misstatement of the law. *Walker v. Endell,* 850 F.2d at 475–76 (citing *Henderson v. Kibbe,* 431 U.S. at 155, 97 S.Ct. 1730). Thus, a habeas petitioner whose claim involves a failure to give a particular instruction bears an " 'especially heavy burden.' " *Villafuerte v. Stewart,* 111 F.3d 616, 624 (9th Cir.1997) (quoting *Henderson v. Kibbe,* 431 U.S. 145, 155, 97 S.Ct. 1730 (1977)).

In this case, the jury heard the victim's properly-admitted testimony as to the prior sexual assault, as set out above. Because the jury knew what he had done, the trial court's failure to instruct the jury that the fact he had been convicted in that case could be considered only as impeachment was not significant. It could not have so infected the trial as to amount to a deprivation of due process. Petitioner's constitutional rights thus were not violated.

### b. Exhaustion

Respondent's contention that this issue was not exhausted in federal terms need not be considered, because the court may deny a claim on the merits even if it is unexhausted. *See* 28 U.S.C. § 2254(b)(2).

### 4. Ineffective assistance of counsel

In order to prevail on a Sixth Amendment ineffectiveness of counsel claim, petitioner must establish two things. First, he must establish that counsel's performance was deficient, i.e., that it fell below an "objective standard of reasonableness" under prevailing professional norms. *Strickland v. Washington,* 466 U.S. 668, 687–88, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Second, he must establish that he was prejudiced by counsel's deficient performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. 2052. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.* Judicial scrutiny of counsel's performance must be highly deferential, and a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *Id.* at 689, 104 S.Ct. 2052. A difference of opinion as to trial tactics does not constitute denial of effective assistance, *United States v. Mayo,* 646 F.2d 369, 375 (9th Cir.), *cert. denied,* 454 U.S. 1127, 102 S.Ct. 979, 71 L.Ed.2d 115 (1981), and tactical decisions are not ineffective assistance simply because in retrospect better tactics are known to have been available. *Bashor v. Risley,* 730 F.2d 1228, 1241 (9th Cir.), *cert. denied,* 469 U.S. 838, 105 S.Ct. 137, 83 L.Ed.2d 77 (1984)

### a. Failure to impeach complaining witness

The victim testified that she and petitioner stopped at an ATM in Mountain View. Petitioner contends that counsel should have impeached her with a bank

statement which he asserts shows that his withdrawal on November 26 (the date of the crime) was at a different ATM. The bank statement provided by petitioner shows that the ATM used on November 26 was in Mountain View, i.e., does not support his contention that the statement could have been used to impeach. *See* ex. G to traverse. In any event, this was a purely collateral matter, and counsel's tactical decision not to impeach on the point was not ineffective.

 Petitioner also asserts that counsel should have called Donald Foote, the victim's boyfriend, as a witness. Petitioner contends that Foote told the police that when the victim called him at the bar, she told him that she and petitioner had stopped to get something to eat and she would be returning to the bar. At trial, the victim testified that she told Foote in the call that they had been driving around, were at the apartment, and would come back to the bar soon. Petitioner contends that his counsel should have called Foote to impeach the victim with this inconsistency. In a *Marsden* hearing[5] trial counsel told the court that he had spoken to Foote at the preliminary hearing and found him very hostile and very protective of the victim. Amended Petition, attached ex. E (transcript of *Marsden* hearing) at 932. In his amended petition, however, petitioner contends that Foote was in New York at the time of the preliminary hearing and at the time of trial. The inconsistency between Foote's alleged police statement and the victim's testimony, if it was existed,[6] was on a minor point; counsel's tactical decision not to pursue it, particularly if it would involve bringing a witness

from New York, was not ineffective assistance.

 Counsel also should have impeached the victim with having been fired from a job with Goodwill Industries for stealing, petitioner contends. Even if this could have been proved, which is open to question on this record, counsel might well feel that it would have been unwise to attack the victim on such a collateral and, by comparison to the charged sex acts, minor, matter. Given this, and the possibility that impeachment on such a collateral and possibly unduly prejudicial matter would not have been allowed, counsel's decision and any lack of investigation was reasonable.

 Petitioner also contends that counsel was ineffective in not calling a witness named Erma Grazes. The victim testified on direct that they stopped at the home of Mrs. Grazes and her son and that petitioner knocked at the door, then came back saying the son was not home. On cross, the victim said that she saw petitioner go up toward the door, but did not actually see him knock on it. Petitioner says that Mrs. Grazes would have been able to testify that his habit when coming to see her son was to stay in the car outside and honk, and that the door is not visible from the street. The asserted inconsistencies between the victim and Mrs. Grazes' purported testimony are so minor that failure to call her could not be ineffective assistance.

 Petitioner also contends that a number of witnesses should have been called by the defense. On this record, *see* ex. E to amended petition (transcript of *Marsden* hearing) at 859–935, it is impossible to conclude that any of the lay wit-

---

5. "So named after *People v. Marsden*, 2 Cal.3d 118, 84 Cal.Rptr. 156, 465 P.2d 44 (1970), it is a motion permitting a defendant to articulate why he is dissatisfied with his court-appointed counsel and why counsel should be relieved." *McNeely v. Blanas*, 336 F.3d 822, 825 n. 3 (9th Cir.2003).

6. The police report is not in the record.

nesses mentioned could have contributed significantly to the defense. Petitioner's explanation is incoherent as to who they were, where they could be found, and what they could testify to, and lacks any indication that he informed his counsel any more clearly about them than he did the court. *Id.* To the extent that most of these witnesses would have been for the purpose of showing the victim's bad character, for instance her "wildness" or misbehavior on unrelated matters, it is improbable, as counsel noted, that the testimony would have been admitted.[7] Counsel's decision not to call them was not ineffective assistance.

■■■ Petitioner also asserts that counsel should have called expert witnesses. It was reasonable for counsel to conclude that it would be unproductive to try to find a "jail doctor" who would testify that the marks on petitioner's face were caused by car keys rather than fingernails,[8] or an expert who could testify from a photograph of the victim's face that a mark was a crack pipe burn. And as respondent points out, calling an expert on the effects of cocaine intoxication might well have backfired, because although such testimony might have had some impeachment value as to the victim's testimony, petitioner had more cocaine in his blood than the victim and also testified. Thus any such expert's testimony which might tend to discredit the veracity of the victim's testimony would have discredited petitioner's testimony even more.

Petitioner also asserts that counsel should have impeached the victim with mi-

nor inconsistencies between her preliminary hearing testimony and that at trial. Although there may have been minor discrepancies, counsel examined the victim thoroughly, and the decision to not use everything is preeminently a tactical decision best made by counsel.

In summary, petitioner has not shown that counsel was deficient, nor that he was prejudiced. The state courts' rejection of these claims therefore was not contrary to, or an unreasonable application of, clearly established Supreme Court authority.

### 5. Shackles

■■■ Petitioner contends that some members of the jury saw his shackles when they were entering the courtroom. The trial court held a hearing on the matter, and after taking evidence from petitioner and the deputies, and standing in the position of the jurors to see the sight lines, concluded that the jurors did not see the shackles. Ex. B at 604–612.. Petitioner has failed to show that this finding "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." ' *Torres v. Prunty*, 223 F.3d 1103, 1107 (9th Cir.2000) (quoting 28 U.S.C. § 2254(d)(2) and *Williams*, 529 U.S. at 412–13, 120 S.Ct. 1495). In any event, a glimpse of shackles while a prisoner is being transported is not presumptively prejudicial, *Williams v. Woodford*, 306 F.3d 665, 691(9th Cir.2002), and petitioner has shown no prejudice. Habeas relief cannot be granted on this issue.[9]

---

7. The victim admitted her drug use, so testimony on that point would have been cumulative.

8. It appears that petitioner may also be trying to contend that the police station photographs would show that he had cuts near *each* eye, rather than just one. His belief that this would discredit the victim's testimony that she gouged his (singular) eye is frivolous.

9. Petitioner may also intend that this be an ineffective assistance of counsel claim. His contention that his lawyer lied when he told the trial court that he was not in the courtroom when the incident happened is not supported by the record, only by petitioner's assertions in his traverse. As to his contention that counsel should have insisted that the jury be "polled," there is no evidence whatever

## CONCLUSION

For the foregoing reasons, the petition for a writ of habeas corpus is DENIED. The clerk shall close the file.

IT IS SO ORDERED.

what the jurors would have said had they been asked, so petitioner has not shown prejudice. He thus has not established that counsel was ineffective.